PUBLIC SERVICE ELECTRIC AND
GAS COMPANY,

       Plaintiff,

v.

NEWPORT ASSOCIATES
DEVELOPMENT COMPANY and
NEWPORT ASSOCIATES PHASE I
DEVELOPERS LIMITED
PARTNERSHIP,

       Defendants.

NEWPORT ASSOCIATES
DEVELOPMENT COMPANY and
NEWPORT ASSOCIATES PHASE I
DEVELOPERS LIMITED
PARTNERSHIP,

       Counterclaim and
       Third-Party Plaintiffs,

v.

PUBLIC SERVICE ELECTRIC AND
GAS COMPANY,

       Counterclaim Defendant,

-and-

CONSOLIDATED EDISON COMPANY
OF NEW YORK,

       Third-Party Defendant.

Civ. No. 16-8445 (KM) (JBC)

**OPINION**

**PUBLIC SERVICE ELECTRIC AND GAS COMPANY,**

        **Crossclaim Plaintiff,**

v.

**CONSOLIDATED EDISON COMPANY OF NEW YORK,**

        **Crossclaim Defendant.**

---

**CONSOLIDATED EDISON COMPANY OF NEW YORK,**

        **Counterclaim Plaintiff,**

v.

**PUBLIC SERVICE ELECTRIC AND GAS COMPANY,**

        **Counterclaim Defendant.**

---

### KEVIN MCNULTY, U.S.D.J.:

Counterclaim and Third-Party Plaintiffs, Newport Associates Development Company ("Newport Development") and Newport Associates Phase I Developers Limited Partnership ("Newport Phase One") (together, "Newport"), seek remedial, statutory, and punitive damages related to an alleged environmental contamination in the Newport Marina in Jersey City ("the Spill"). Newport, originally sued by Public Service Electric and Gas Company ("PSE&G") in connection with the Spill, brings claims against PSE&G as Counterclaim Defendant, and against Third-Party Defendant Consolidated Edison Company of New York ("Con Edison"). (Con Edison and PSE&G are referred to collectively as the "Utilities".).

Newport seeks relief from the Utilities under both federal and state statutes. Under the federal Oil Pollution Act (the "OPA"), Newport seeks removal

2

costs and statutory damages (count VIII); declaratory judgment (count IX); and contribution (count X). Under the New Jersey Spill Compensation & Control Act (the "Spill Act"), Newport seeks contribution and declaratory relief (count XIII). Under the Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA"), Newport seeks response costs, contribution, and declaratory judgment (count XIV). Last, Newport seeks a citizen-suit injunction under the Hazardous Liquids Pipeline Safety Act ("HLPSA") (count XV). These counts are not implicated by the motion now before the Court.

Against PSE&G alone, Newport brings claims for breach of an easement (count I), termination or modification of the easement (count VII), and indemnification under the easement (count XI). These counts are not implicated by the motion now before the Court.

Against both Utilities, Newport brings claims for pre-Spill negligence (count II); negligence in responding to the Spill (count III); trespass (count IV); nuisance (count V); strict liability for ultrahazardous or abnormally dangerous activities (count VI); and indemnification under an access agreement (count XII).

Before the Court is Con Edison's motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss four of these counts: pre-Spill negligence (count II); strict liability for ultrahazardous or abnormally dangerous activities (count VI); trespass (count IV); and nuisance (count V). For the reasons discussed below, Con Edison's motion to dismiss is granted in part and denied in part.

# I. Summary[1]

## a. Background

I focus here on the facts alleged in the amended third party Complaint that are relevant to the four counts targeted by the motion to dismiss.[2]

---

[1] For ease of reference, certain key items from the record will be abbreviated as follows:

| "A3PC" | = | Amended Third-Party Complaint | [DE 98] |
| "Mot. to Dismiss" | = | Con Edison's Motion to Dismiss the Amended Third-Party Complaint | [DE 100] |
| "Def's Br." | = | Con Edison's Brief in Support | [DE 100-1] |
| "Pl. Opp'n" | = | Newport's Opposition | [DE 112] |
| "Def's Reply" | = | Con Edison's Reply Memorandum in Support | [DE 115] |

[2] For purposes of the motion to dismiss, the factual allegations of the amended third-party complaint are taken as true. *See* Section II.a, *infra*.

Con Edison has cited several documents in support of its motion to dismiss, including: (i) two interconnection agreements between PSE&G and (ii) Con Edison and Newport's declarations and supporting documents to its own motion to dismiss PSE&G's amended complaint. (*see e.g.*, DE 100, 6).

Rule 12(d) provides that if a moving party submits materials beyond the pleadings, the motion may be converted to a motion for summary judgment rather than treated as a motion to dismiss. However, exhibits attached to or integral to a complaint are properly considered on a Rule 12(b)(6) motion. In deciding motions under Rule 12(b)(6), courts may consider "document[s] integral to or explicitly relied upon in the complaint," *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997), or any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *PBGC v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

Con Edison argues that the Court should consider all cited documents as "integral to or explicitly relied upon" in the complaint. (DE 100, 3 & n.1). For purposes of this motion to dismiss opinion, I will consider the 1975 interconnection agreement (the "1975 ICA"), which Newport expressly relies upon in the third-party complaint. (see DE 98, ¶ 21) (quoting the 1975 ICA to support that Con Edison and PSE&G participated in the design, construction, maintenance, and repair of the Cables). That being said, it makes little difference in this matter—at this stage, I cannot engage in the kind of advanced contract construction that requires factual interpretation.

### i. The parties

Newport Development is a New Jersey general partnership with its principal place of business in Jersey City, New Jersey. (A3PC ¶ 16). Newport Phase One is a New Jersey limited partnership with its principal place of business at the same address as Newport Development. (*Id.* ¶¶ 16–17). PSE&G is a New Jersey corporation with its principal place of business in Newark, New Jersey. (*Id.* ¶ 18). Con Edison is a New York corporation with its principal place of business in New York City. (*Id.* ¶ 19).

### ii. Installation of the cables

The Utilities own and operate two 350kV electric cables that transmit electricity from Jersey City, New Jersey, to Brooklyn, New York (the "Cables"). (A3PC ¶ 24). The Cables run overland from PSE&G's Hudson substation in Jersey City, under the Hudson River, overland through Manhattan, and then under the East River to Con Edison's Farragut substation in Brooklyn. (*Id.*). The Cables do not supply electricity to Newport's property or any other property in New Jersey. (*Id.*). Rather, the Cables supply electricity to Con Edison's customers in New York. (*Id.*).

The first Cable, as well as the steel pipe for the second Cable, were installed in 1972. (A3PC ¶ 25). The second Cable was installed in 1982. (*Id.*). Both Con Edison and PSE&G participated in the design and construction of the Cables, as well as the maintenance and repair (or lack thereof) of the Cables. (*Id.* at ¶ 21). Among other agreements, the "1975 ICA" between Con Edison and PSE&G provided as follows: "In behalf of Con Edison and [PSE&G], Con Edison shall maintain the entire river crossing section of the [Cables]. All maintenance costs so incurred shall be shared equally by the parties hereto." (*Id.*).

Con Edison never certified to PSE&G that construction of the Cables was substantially complete, never obtained a certificate of occupancy or similar document from any relevant government regulator, and never ceased performing services on the Cables, including the portion of the Cables owned by Con Edison. (A3PC ¶ 22). In Newport's view, these facts support an

5

inference that Con Edison never relinquished its role with respect to the Cables.[3]

Each electric Cable is seven miles long and is housed in a steel pipe with a 10-inch diameter. (A3PC at ¶ 26). The pipes are generally encased in coal tar and, except around the welds, concrete. (*Id.*). The pipes contain dielectric fluid, a refined petroleum product, to insulate the Cables. (*Id.*).

The dielectric fluid circulates throughout the entire length of the Cables and through onshore storage tanks. (A3PC at ¶ 27). Over the years, the Utilities have from time to time added new dielectric fluid to the storage tanks to replace fluid that has leaked into the environment. (*Id.*).

The Cables are designed to operate even while leaking, provided that additional dielectric fluid is pumped into the Cables to replace leaking fluid. (A3PC at ¶ 28). A pressure sensor, the sole system to detect leaks, is designed to sense only large leaks. The sensor may detect the existence of a leak, but not its location. The present Spill, which has been ongoing since at least October 2016, has not triggered the pressure sensor. (*Id.*).

The Army Corps of Engineers (the "ACOE") and the New Jersey Department of Environmental Protection (the "NJDEP") issued permits for the Cables. The permits required a six-foot protective layer of crushed stone. (A3PC ¶ 29). The Utilities failed to install the required layer of crushed stone, at least along the hundreds of feet of the Cables in the vicinity of the Pier that have now been excavated or lanced. (*Id.*).

---

[3]     Newport alleges that "Con Edison has retained actual possession and control over the Cables at all relevant times." (*Id.*) I interpret that statement as a legal conclusion relevant to the requirements of the statute of repose, discussed at Section II.b, *infra. See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (conclusory legal statements not considered in Rule 12(b)(6) analysis).

### iii.  The Easement

In 1986, Newport acquired a portion of the riverbed of the Hudson River, adjacent to Jersey City. The Cables pass over that portion of the riverbed. At the time Newport acquired the property, the Cables were already installed. (A3PC at ¶ 31).

On January 1, 1987, Newport and PSE&G entered into an easement agreement (the "Easement") that superseded all prior agreements between their predecessors in interest. (A3PC at ¶ 32). The Easement runs parallel to the Pier, approximately 5 to 35 feet north of the Pier, and is about 30 feet wide. (*Id.*).

At the time the Easement was negotiated, PSE&G knew of the true risks of a leak, but failed to disclose them and affirmatively concealed them from Newport. (A3PC at ¶ 33). PSE&G did not disclose design flaws that increased the likelihood of leaks and decreased the likelihood of their detection. (*Id.*). PSE&G also did not disclose Cables' non-conformities to the permit conditions. (*Id.*). PSE&G also did not disclose pre-existing damage to Cables, including damage from contact with a tugboat propeller and barge-mounted crane. (*Id.*).

### iv.  Maintenance, repair, protection, and replacements

Following the design and installation of the Cables, Newport alleges, the Utilities continued to be reckless in (1) failing to properly maintain, repair, and protect the Cables (A3PC at ¶¶ 38–40); and (2) failing to replace the Cables despite the fact that they have exceeded their useful life. (*Id.* at ¶ 41–44).

### v.  The Spill

The Spill was discovered on October 3, 2016. (A3PC at ¶ 45). The Cables are the source of the Spill. (*Id.*).

In July 2017, the Utilities' divers discovered the leak in the Cables which was the source of the Spill. (A3PC at ¶ 46). The leak was caused by a welding flaw, known as a lack-of-fusion defect. (*Id.*). The defective weld is located on an irregularly-spaced coupler. (*Id.* at ¶ 47).

7

The Cables were fabricated in 20-foot segments. (A3PC at ¶ 47). In a land-based factory, pairs of 20-foot segments were welded together to form 40-foot segments. (*Id.*). Then, on a vessel in the river, 40-foot segments were welded together, and the Cables were dropped to the riverbed. (*Id.*). As a result, the Cables have regularly-spaced welds every 20 feet. (*Id.*). The defective weld, however, is not a regularly-spaced weld. (*Id.*). Rather, the defective weld is on one of three irregularly-spaced couplers, which appear to have been installed after a piece of pipe was "cut out" and replaced. (*Id.*). The written plans for the Cables do not include these irregularly-spaced couplers. (*Id.* at ¶ 48).

### vi. Damage from the Spill

The Spill has polluted Newport's property. The response to the Spill has interfered with Newport's property and imposed substantial economic costs on Newport. (A3PC at ¶ 51). The Coast Guard, which has overseen the response to the Spill, determined that the Spill posed an imminent and substantial threat to the public health or welfare of the United States or the environment of the United States. Accordingly, the Coast Guard invoked its authority under the Clean Water Act to direct all federal, state, and private actions to remove the discharge and to mitigate or prevent the threat of the discharge. (A3PC at ¶ 52).

On October 6, 2016, NJDEP issued a field directive to PSE&G finding PSE&G responsible for the Spill. (A3PC at ¶ 52).

On November 17, 2016, the Coast Guard issued an administrative order directing Newport to, among other things, remove certain debris from the Easement area. (A3PC at ¶ 54). Newport complied with the Coast Guard's order. (*Id.*). In order to comply, Newport incurred and continues to incur additional costs. (*Id.*).

Newport's costs have been increased by the Utilities' conduct since the spill. (DE 98, ¶¶ 55, 57, 59–63).

### b. Procedural history

I write for the parties and so assume familiarity with the procedural history of this matter, including my previous filed opinion (DE 62). I highlight here some items particularly pertinent to these motions.

On February 14, 2017, PSE&G filed an amended complaint against Newport. (DE 40).

On March 14, 2017, Newport filed a motion to dismiss the amended complaint. (DE 43).

On December 28, 2017, I filed an opinion (DE 62) and order (DE 63) granting in part and denying in part Newport's motion to dismiss.

On February 9, 2018, Newport filed an answer to the amended complaint with a third-party complaint against Con Edison and a counterclaim against PSE&G. (DE 72).

On April 13, 2018, PSE&G filed an answer to Newport's counterclaim with a crossclaim against Con Edison. (DE 81).

On the same date, Con Edison filed a motion to dismiss certain counts in the third-party complaint. (DE 85).

On May 21, 2018, Newport filed an amended answer to the amended complaint with a third-party complaint against Con Edison and a counterclaim against PSE&G. (A3PC).

On June 11, 2018, PSE&G filed an answer to Newport's counterclaim with a crossclaim against Con Edison. (DE 99).

On June 15, 2018, Con Edison filed a motion to dismiss the amended third-party complaint. (Mot. to Dismiss).

On August 6, 2018, Newport filed a response in opposition to Con Edison's motion to dismiss the amended third-party complaint. (Pl's Opp'n).

On August 24, 2018, Con Edison filed a reply brief to Newport's opposition to Con Edison's motion to dismiss the amended third-party complaint. (Def's Reply).

I now consider Con Edison's motion to dismiss four counts of the amended third-party complaint. For the reasons set forth below, I will deny

Con Edison's motion to dismiss the negligence claim and strict liability claim, and I will grant Con Edison's motion to dismiss the trespass and nuisance claims.

## II.    Discussion

### a. Legal standard

Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n. 9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also West Run Student Housing Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

### b. Pre-spill negligence (count II)

Newport brings a negligence claim against the Utilities arising from their responsibility for the Cables. (A3PC at ¶80). Count Two alleges that, in

connection with the Cables, the Utilities owed Newport a duty of care not to damage Newport's property or to inflict foreseeable economic harm upon Newport. (*Id.* at ¶ 79). The Utilities allegedly breached that duty of care by failing "to properly install, maintain, repair, protect, and replace the Cables." (*Id.* at ¶ 80). By breaching that duty, the Utilities allegedly damaged Newport by, *inter alia*, causing the Spill and delaying the response to the Spill. (*Id.* at ¶¶ 80–81). (*See also Id.* at ¶ 51) ("The Spill has polluted Newport's property, and the response to the Spill has interfered with Newport's property and imposed substantial economic loss on Newport.").

Con Edison does not argue that Newport's negligence claim should be dismissed for failure to plead an essential element.[4] Rather, Con Edison asserts that Newport's claim is barred by a New Jersey ten-year statute of repose, N.J. Stat. Ann. § 2A:14-1.1(a). (Def's Br., 9–16).

Unlike a statute of limitations, which defines the point at which an accrued claim becomes stale (subject to tolling doctrines and the like), a statute of repose defines a temporal limit that is a component of the cause of action itself. *See Rosenberg v. Town of N. Bergen*, 293 A.2d 662, 667 (N.J. 1972). Outside the prescribed period, "[t]he injured party literally has no cause of action. The harm that has been done is *damnum absque injuria*—a wrong for which the law affords no redress." *Id.*

The relevant statute of repose places a ten-year time limit on certain actions stemming from unsafe improvements to real property:

> No action, whether in contract, in tort, or otherwise, to recover damages for any deficiency in the design, planning, surveying, supervision or construction of an improvement to real property, or for any injury to property, real or personal, or for an injury to the person, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, nor any action for contribution or indemnity for damages sustained on account of such injury, shall be brought against any person

---

[4] Under New Jersey law, to bring a negligence claim, a plaintiff must plead the following four elements: (1) duty of care, (2) breach, (3) proximate cause, and (4) actual damages. *Polzo v. Cty. of Essex*, 960 A.2d 375, 384 (N.J. 2008).

performing or furnishing the design, planning, surveying, supervision of construction or construction of such improvement to real property, more than 10 years after the performance or furnishing of such services and construction. This limitation shall serve as a bar to all such actions, both governmental and private, but shall not apply to actions against any person in actual possession and control as owner, tenant, or otherwise, of the improvement at the time the defective and unsafe condition of such improvement constitutes the proximate cause of the injury or damage for which the action is brought.

N.J. Stat. § 2A:14-1.1(a).

This federal court must interpret the statute in accordance with state law. *Kozikowski v. Delaware River Port Auth.*, 397 F. Supp. 1115, 1121 (D.N.J. 1975). In interpreting a statute of repose (or any statute for that matter), the court "should not resort to extrinsic interpretative aids when the statutory language is clear and unambiguous, and susceptible to only one interpretation." *Daidone v. Buterick Bulkheading*, 924 A.2d 1193, 1198 (N.J. 2007) (internal citations omitted). That being said, "if there is ambiguity in the statutory language that leads to more than one plausible interpretation, [the court] may turn to extrinsic evidence, including legislative history, committee reports, and contemporaneous construction." *Id.*

On a plain reading of the statutory text, I find that the statute of repose applies where four conditions are present:

(1) The plaintiff must be asserting a claim "arising out of the defective and unsafe condition of an improvement to real property" alleging any of the following: (a) "deficiency in the design, planning, surveying supervision or construction of an improvement to real property;" (b) "injury to property, real or personal[;]" (c) injury to the person; or (d) bodily injury or wrongful death. N.J. Stat. Ann. § 2A:14-1.1(a).[5]

---

[5]     *See also E. A. Williams, Inc. v. Russo Dev. Corp.*, 411 A.2d 697, 702 (N.J. 1980) (explaining that the court "appl[ies] the adjectival clause relating to "defective and unsafe" conditions as qualifying all of the situations mentioned in the statute.").

(2) The tort claim must be brought against a "person performing or furnishing the design, planning, surveying, supervision of construction or construction" of the alleged defective and unsafe improvement. *Id.*

(3) The claim may not be brought "more than 10 years after the performance or furnishing of such services and construction." *Id.*

(4) The claim cannot be an action against "any person in actual possession and control as owner, tenant, or otherwise." *Id.*

In a sufficiently clear case, those factors might be established by the pleadings. This is not that clear case. I do not say that Newport's pre-spill negligence claim based on Con Edison's participation in the design and installation of the Cables, for example, might not eventually be found to fall within the protection of the statute of repose. (*See* Am. Compl. at ¶¶ 78–81). The statute's application, however, depends on certain antecedent facts which cannot be determined on this motion to dismiss.

### i. Damages for a defective and unsafe improvement

I turn to the first requirement, which is compound. First, Newport argues that the Cables are not an improvement to real property. I address that argument at Section II.b.i.1, *infra*. Second, Newport argues that the statute does not bar the claim to the extent that it pleads only economic damages. (Pl's Reply, 23–25). I address that argument at Section II.b.i.2, *infra*.

### 1. Improvement to real property

Newport argues that the Cables are not an improvement to real property. The statute does not define an "improvement." *Compare* N.J. Stat. Ann. § 2A:14-1.1 (no definition of "improvement") *with* N.J. Stat. Ann. § 2A:30A-1 (defining "improve"), and N.J. Stat. Ann. § 2A:44A-2 (defining "improvement"). BLACK'S LAW DICTIONARY (10th ed. 2014) defines an "improvement" as "[a]n addition to property, usu[ally] real estate, whether permanent or not; esp[ecially], one that increases its value or utility or that enhances its appearance. — Also termed land improvement."

Further insight can be gained from case law explicating this statute. An important key to interpretation of this statute of repose is the New Jersey Supreme Court case of *Rosenberg v. Town of N. Bergen, supra*. In *Rosenberg*, a plaintiff walking in a public roadway tripped over a fissure in the pavement. He sued the asphalt company that paved the road, as well as its successor-in-interest. *Rosenberg* 293 A.2d at 663. To apply the statute of repose, the Court first had to consider whether paving a public highway constitutes an "improvement" to real property. *Id.* at 664–66.

*Rosenberg* noted intially that the statute fails to define an "improvement," and that the legislative materials are unhelpful. 293 A.2d at 664 ("[T]he available materials touching [the] legislative history [of N.J. Stat. Ann. § 2A:14-1.1(a)] are meager and unrevealing."); *see also Greczyn v. Colgate-Palmolive*, 869 A.2d 866, 868 (2005) ("The legislative history of the act is singularly unhelpful.").[6]

*Rosenberg* therefore looked to other states' similar statutes of repose. All, the Court noted, were enacted in reaction to two trends in the law. *Id.* at 664–666. The first was the development of the "discovery rule," under which a

---

[6]     While on the topic of *Rosenburg*, I address a side issue. Throughout its briefing, Newport implies that Con Edison, a utility, is not within the class of persons the statute was intended to protect because it is not an architect or contractor. (Pl's Reply, 2, 14). The *Rosenberg* Court considered whether the statute of repose violated the "special law" prohibition of N.J. Const. art. IV, § 7, ¶ 9. *Rosenberg*, 293 A.2d 662 (1972). The Court held that the statute did not violate the special law prohibition because it protected a broad class. *Id.* Interpreting the breadth of the class, the Court stated that the statute extends to "all who can, by a sensible reading of the words of the act, be brought within its ambit." *Id.* at 666. While the beneficiaries of the statute of repose have been referred to as "architects and building contractors," the favored class is "much larger" and includes "*any person* performing or furnishing the design, planning, supervision of construction or construction of such improvement to real property." *Id.* at 668 (citations omitted).

At least at this stage of the litigation, I cannot conclude that the role of Con Edison carried it outside the class of persons embraced by the statute. (*See* Am. Cmplt. at ¶ 21) ("Both Con Edison and PSE&G participated in the design and construction of the Cables and the maintenance and repair (or lack thereof) of the Cables.").

statute of limitations is held not to commence until a wrong was discovered or should have been detected. *Id.* at 664–665. The second was the erosion of the "completed and accepted rule," which had previously relieved builders and contractors from liability once their work had been completed and accepted by the owner. *Id.* at 665–666. Faced by "increased exposure on the part of architects, contractors and the like . . . the Legislature sought to provide what it deemed to be a reasonable measure of protection against this greater hazard." *Id.* at 666.

In the Court's estimation, the New Jersey statute was enacted to address similar concerns. Considering the statute's likely context and purpose, the Court held that it should be interpreted broadly:

> [T]he statute should be given a broader sweep . . . If the condition to which the Legislature addressed itself was this extension of potential liability, then there seems no reason not to include within the favor of the statute *all to whom this condition may adhere* whether they be planners and builders of *structures, roads, playing fields or aught else that by broad definition can be deemed 'an improvement to real property.'*

*Rosenberg*, 293 A.2d at 666 (emphasis added). Under that broad approach, *Rosenberg* held, the paving of a public road constituted an "improvement" to real property. *Id.*

The subsequent case of *Ebert v. S. Jersey Gas Co.*, 723 A.2d 599 (N.J. 1999), sheds some light on the statute's application to utility lines. There, a gas company sued a construction company that had installed service lines between a gas main under a street and adjacent homes on that street. *Id.* at 600. Roughly thirty-four years after the construction company installed the lines, a gas explosion occurred at one of the homes. *Id.* To apply the statute of repose, the court initially had to determine whether such a service line was an improvement to property. The court considered five factors: Whether the modification or addition: (1) "enhances the use of the property," (2) "involves the expenditure of labor or money," (3) "is more than mere repair or replacement," (4) "adds to the value of the property," and (5) "is permanent in

nature." *Ebert*, 723 A.2d 599, at 601.[7] A service line, the Court concluded, was a permanent improvement, constructed anew at some expense, which (until the explosion occurred, of course) added value to the home. *Ebert*, 723 A.2d at 602 (citing *Van Den Hul v. Baltic Farmers Elevator Co.*, 716 F.2d 504, 508 (8th Cir. 1983) (holding that utility line improves real property); *Delgadillo v. City of Socorro*, 723 P.2d 245, 248 (N.M. 1986) (same); *Washington Natural Gas Co. v. Tyee Constr. Co.*, 611 P.2d 1378, 1381 (Wash. Ct. App. 1980) (same)).

Here, the alleged "modifications" or "improvements" are the Cables, which lie on the Hudson riverbed, running close to the Pier. While I found no case precisely on point, I look to the reasoning of *Ebert, supra,* which held that a utility line (there, a gas line) can be an improvement to real property. 723 A.2d at 602.[8] Interpreting the statute of repose, I apply a "broad definition" of improvement, *see Rosenberg*, 293 A.2d at 666, and apply the five factors identified in *Ebert, see* p. 16, *supra*.

The fabrication and laying of the Cables self-evidently required significant expenditures of labor and money. (*See* A3PC at ¶ 47) (describing how the Cables were fabricated, welded together twice, and eventually dropped to the riverbed from a boat). The Cables' original installations were intended to be permanent. These installations went beyond mere replacements of, or repairs to, existing facilities.[9]

---

[7]     As to the final, "permanent" factor, the standard dictionary of legal terms seems to disagree. Its definition of an "Improvement" is "[a]n addition to property, usu. real estate, *whether permanent or not*; esp., one that increases its value or utility or that enhances its appearance." *Black's Law Dictionary* (10th ed. 2014) (emphasis added).

[8]     *Ebert* held that although laying a telephone line beneath a street may not improve the value of the street, it may still "add[] value to adjacent properties" by providing them with service. 723 A.2d at 601 (overruling *Washington v. City of Elizabeth*, 585 A.2d 431 (Law Div. 1990) (holding that telephone company's excavation of public street to install lines was not an improvement, because it served the nearby houses, not the street itself)). *Ebert* rejected *Washington*, but I do not interpret its language as stating the *only* way such a line may constitute an improvement to property, public or private.

[9]     The issue may become more complicated and fact-bound when we look beyond the original design and installation, and consider subsequent repairs and

It is plausible that the Cables add value to and enhance the use of real property. They run across the real property in question, consisting of a 30-foot-wide strip of the Hudson riverbed. (Am. Complt. at ¶ 32). That strip of earth is certainly more useful and valuable with a utility line than without. *Cf. Pippin v. Reilly Indus., Inc.*, 64 F. App'x 382, 387 (4th Cir. 2003) (applying Maryland law) (holding that a utility pole "installed in an empty field, on a parcel of land that was theretofore undeveloped" was an improvement). *See also Montaup Elec. Co. v. Ohio Brass Corp.*, 561 F. Supp. 740, 748 (D.R.I. 1983) (applying Massachusetts law) ("It cannot be gainsaid that the erection of electrical transmission lines comprises a permanent addition to real property; that such a project involves the expenditure of labor and of money; and that completion thereof makes the property more useful or valuable.").

If the real property is defined as being limited to the portion consisting of or containing PSE&G's easement with Newport, then the Cables' status as an "improvement" is even clearer. PSE&G, in its narrow capacity as the holder of the easement, benefits from the Cables, which permit it to transmit a "precious and utilitarian commodity—electricity." *Montaup*, 561 F. Supp. at 748 (holding that an electric transmission line running across power line easements is an improvement under a similar statute of repose). Aside from the Cables, it is unclear what value this subaquatic real estate, or the associated easement, would possess. It is probably only because of the Cables that the property has value to the owner or easement holder.

In short, the allegations will easily bear the interpretation that the Cables constitute an improvement to property for purposes of the first requirement for application of the statute of repose.

### 2. Economic damages

Newport argues that the statute of repose does not bar, but "generally permits the recovery of damages for "economic injury" or "consequential

---

modifications. My task here, however, is to determine whether this Count states a cause of action.

economic losses." (Pl's Opp'n at 24) (quoting *E.A. Williams, Inc. v. Russo Dev. Corp.*, 411 A.2d 697, 703 (N.J. 1980)).

That is a keyhole view; what the statute covers is an action "arising out of the defective and unsafe condition of an improvement to real property" which seeks "damages [a] for any deficiency in the design, planning, surveying, supervision or construction of an improvement to real property, *or* [b] for any injury to property, real or personal, *or* [c] for an injury to the person, *or* [d] for bodily injury or wrongful death . . . ." N.J. Stat. Ann. § 2A:14-1.1(a) (emphasis and [bracketed] letters added). *Every* action subject to the statute of repose must be one that arises from a "defective and unsafe condition" of the property improvement. *In addition*, the action must fit within one of the four identified categories, a, b, c, or d, *supra*. *See E. A. Williams, Inc.* 411 A.2d at 702 (explaining that the court "appl[ies] the adjectival clause relating to "defective and unsafe" conditions as qualifying all of the situations mentioned in the statute.").

*E.A. Williams* dealt primarily with the threshold requirement that the action arise from an "unsafe condition." It held that surveying error that forced a plaintiff to construct a new loading dock did not qualify; such an error might cause the dock to be mislocated, but would not in itself create a hazard. The action, then, was not one arising from an "unsafe condition." *Id.* at 703.

By way of illustrating its point that the surveying error did not create an unsafe condition, *E.A. Williams* stated that it "resulted in [the dock's] functional impairment with consequential economic losses entailed in its correction." *Id.* The following sentence, however, states that "[t]he statute does not cover this *type of defect*." *Id.* (*emphasis* added). *E.A. Williams* was discussing the threshold requirement that the action arise from a "defective and unsafe condition."

To say that such a defect may result in the functional impairment of the property—a truism, in most cases—is not to dispense with the fundamental requirement that the action arise from a hazardous condition:

18

"[F]unctional impairment is not some talisman that by its mere invocation wards off the statute's repose. . . . Every defective and unsafe condition will impair a building functionally, in that one cannot use it if it is unsafe. The converse, however, is not necessarily true—every functional impairment does not necessarily carry with it an unsafe and defective condition."

*Newark Beth Israel Med. Ctr. v. Gruzen & Partners*, 590 A.2d 1171, 1176 (N.J. 1991) (internal citations omitted).

On the "unsafe condition" issue, Newport stresses that the third-party complaint does not allege injury sustained while using or attempting to use the Cables. (Pl's Opp'n at 25). It cites *E.A. Williams* for the proposition that the statute applies only to claims based on a person's or a property's "coming into contact with the improvement or structure "came into contact with the unsafe improvement or structure in the course of using or preparing to use the structure for its intended purpose." *Id.* at 702. The full quotation, however, invokes the creation of a "hazardous *condition.*" *Id.* (*emphasis* added). The supporting line of cases cited in *E.A. Williams* contains examples of both actual accidents and conditions that posed a danger.[10]

The complaint, however, will bear the interpretation that it alleges a predicate unsafe condition. The defect on which the action is based consists of the leaks in the housing of the Cables, which created the Spill. The amended third-party complaint alleges that the leaks constituted a dangerous, injurious condition. (*See* A3PC at ¶ 52 ("The Coast Guard determined that the Spill posed an imminent and substantial threat to the public health or welfare of the

---

[10]   The string citation included the following:

*Hudson Cty. v. Terminal Construction Corp.*, 154 N.J. Super. 264, 381 A.2d 355[, 356] (App. Div. 1977), *certif. den.* 75 N.J. 605, 384 A.2d 835 (1978) (ceramic tiles installed in building began to crumble and fall, creating a "hazardous condition"); . . . *Salesian Society v. Formidi Corp.*, 120 N.J. Super. 493, 295 A.2d 19 (Law Div. 1972), *aff'd o. b.* 124 N.J. Super. 270, 306 A.2d 466 (App. Div. 1973) (water leaks damaged building's support structures).

*E. A. Williams*, 411 A.2d at 702–03.

United States or the environment of the United States, and accordingly invoked its authority under the Clean Water Act to direct all federal, state, and private actions to remove the discharge and to mitigate or prevent the threat of the discharge.")).[11]

On this basis, too, the allegations meet the first requirement for application of the statute of repose.

### ii. Person performing design, supervision, construction

Requirement (2) is also met by the allegations. The amended third party complaint states that "[b]oth Con Edison and PSE&G participated in the design and construction of the Cables and the maintenance and repair (or lack thereof) of the Cables." (A3PC at ¶ 21)).

### iii. The ten-year time period

Requirement (3) of the statute of repose is that the ten-year period has run. The statute of repose begins to run once the project is substantially completed. *Russo Farms, Inc. v. Vineland Bd. of Educ.*, 675 A.2d 1077, 1093 (N.J. 1996). In the construction industry, substantial completion is commonly signified by a certificate of occupancy. *Id.* at 1093. A certificate of occupancy is not always necessary, *see Daidone v. Buterick Bulkheading*, 924 A.2d 1193 (N.J. 2007), but its lack may render the date of completion a factual issue requiring the consideration of proofs.

At this point, I cannot determine from the face of the pleadings when Con Edison's project or task was substantially completed. I therefore will hold the issue pending discovery and deny dismissal at the present time.

---

[11]     *See also* A3PC at ¶ 3) ("The Cables were recklessly designed and installed in the 1970s and 1980s, with, among other defects, no effective means of preventing, detecting, or locating leaks such as the Spill."); *Id.* at ¶ 29 (discussing Utilities' failure to consistently install a six-foot protective layer of crushed stone); *Id.* at ¶ 45 (alleging that the Coast Guard's test reveals that the pollutant spilled in the Hudson River is "dielectric fluid, the same fluid used in the Cables"); *Id.* at ¶¶ 46–50 (discussing a lack of concrete wrapping).

### iv.  Actual possession and control

The statute of repose does not protect the actual owner of the improvement, or a party who otherwise exercises actual possession and control. N.J. Stat. Ann. § 2A:14-1.1(a). Here, Newport argues that Con Edison is in "actual possession and control" of the Cables. (Pl's Reply at 15–18).

Reviewing the allegations of the third-party complaint, I remain unclear as to whether and at what dates Con Edison actually possessed and controlled the Cables on the easement.[12] This issue, too, may be resolved by discovery.

*      *      *

For the reasons discussed above, the application of the statute of repose depends on facts that require discovery. It therefore cannot serve as a basis for dismissal of Newport's pre-Spill negligence claim at this time. The motion to dismiss count two is denied.

---

[12]  Con Edison argues that it does not control the Cables because PSE&G owns the portion of the Cables that lies in New Jersey. (Def's Br. at 16) (citing PSE&G's Decl. of Anthony Dangelo, dated Nov. 11, 2016 at ¶ 3) ("PSE&G maintains ownership of the Cables in New Jersey and Con Edison maintains ownership in New York.")). At this point in the litigation, I cannot engage in contractual interpretation that may require a factual context. The amended third-party complaint itself contemplates that related and similar agreements exist (A3PC at ¶ 21), and, as Newport notes, the full record of the agreements between the Utilities is not before the court. (Pl's Opp'n at 18).

Newport argues in the alternative that Con Edison, if it did not own the Cables, otherwise possessed and controlled them. (Pl's Opp'n at 15–16). Con Edison, it says, maintains the Cables and co-operates them with PSE&G. Con Edison responds that it does so only with the permission of Newport and PSE&G, and that it has maintained PSE&G's portion of the Cables pursuant to contract, not as an owner or party in control. Newport replies, *inter alia*, that Con Edison is sole holder of the Army Corps permit for the cable. As should be apparent, this is a highly fact-bound issue, unsuitable for resolution on a motion to dismiss.

### c. Strict liability for ultrahazardous or abnormally dangerous activities (count VI)

Count six alleges that the Cables are ultrahazardous and abnormally dangerous. For that reason, says Newport, the Utilities are strictly liable for all damage caused by the Cables. (A3PC at ¶¶ 95–96).

To determine whether an activity is abnormally dangerous, and therefore subject to strict liability, New Jersey has adopted the factors set forth in the *Restatement of Torts*:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
> (b) likelihood that the harm that results from it will be great;
> (c) inability to eliminate the risk by the exercise of reasonable care;
> (d) extent to which the activity is not a matter of common usage;
> (e) inappropriateness of the activity to the place where it is carried on; and
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

*Restatement (Second) of Torts* § 520 (1977) (cited in *T & E Indus., Inc. v. Safety Light Corp.*, 587 A.2d 1249, 1260 (N.J. 1991)).

"Under *Restatement* analysis, whether an activity is abnormally dangerous is to be determined on a case-by-case basis, taking all relevant circumstances into consideration." *State, Dep't of Envtl. Prot. v. Ventron Corp.*, 468 A.2d 150, 159 (1983). "Applying the Restatement multi-faceted test, courts agree that the question of whether a specific activity is abnormally dangerous and, thus, gives rise to strict tort liability, is a question of law for the court to resolve." *Senisch v. Tractor Supply Co.*, No. 1:16-CV-47, 2018 WL 324717, at *10 (D.N.J. Jan. 8, 2018), *appeal dismissed*, No. 18-1265, 2018 WL 3933746 (3d Cir. Apr. 23, 2018).

Self-evidently, application of these factors will commonly present a set of factual issues not easily resolved on a motion to dismiss. Although the issue is ultimately one of law, whether an "activity is an abnormally dangerous one is to be determined by the court, upon consideration of all the factors listed in this Section, and the weight given to each that it merits *upon the facts in evidence*."

22

*In re Complaint of Weeks Marine, Inc.*, No. CIV.A. 04-494, 2005 WL 2290283, at *5 (D.N.J. Sept. 20, 2005), *aff'd in part*, 270 F. App'x 97 (3d Cir. 2008) (emphasis added) (citing *Restatement* § 520, comment *l*). For that reason, "Restatement § 520 analysis is more appropriately undertaken upon a more complete record." *Id.*

The motion to dismiss count six is therefore denied.

### d. Trespass (count IV); and nuisance (count V)

Count four claims that the Utilities committed trespass by intentionally, recklessly, or negligently causing dielectric fluid to be discharged from the Cables onto Newport's property—both within and outside the area covered by PSE&G's Easement—without Newport's consent. (A3PC ¶ 87–88). Count five claims that the Utilities created a nuisance because the dielectric fluid leak interfered with Newport's use and enjoyment of its property. (*Id.* at ¶¶ 92–93). Con Edison argues, *inter alia,* that the Newport's trespass and nuisance claims are subsumed by the New Jersey Spill Compensation and Control Act. (Def's Br. 24; *see* A3PC Count XIII).[13]

"Trespass is a cause of action for one's unauthorized entry (usually of tangible matter) onto the property of another." *Woodcliff, Inc. v. Jersey Const., Inc.,* 900 F. Supp. 2d 398, 402 (D.N.J. 2012) (internal citations omitted). Private nuisance consists of "an unreasonable, unwarranted or unlawful use by a person of his real property which is resulting in a material annoyance, inconvenience or hurt." *New Jersey Tpk. Auth. v. PPG Indus., Inc.,* 16 F. Supp. 2d 460, 478 (D.N.J. 1998), *aff'd,* 197 F.3d 96 (3d Cir. 1999). It is aimed at

---

[13] Because I dismiss on those grounds, I do not reach others.

As to trespass, Con Edison also argues the leaks were permitted under the terms of the easement, and that to the extent the claim rests on trespass to the river waters (in which Con Edison has no property rights), it is invalid. (DE 100, 22–23).

As to nuisance, Con Edison adds that the claim should be dismissed to the extent it affected Newport's own property, as opposed to "neighboring or adjoining property." (DE 100, 23) (citing *EPEC Polymers, Inc. v. NL Indus., Inc.,* No. CIV. A. 12-3842 MAS, 2013 WL 2338711, at *13 (D.N.J. May 28, 2013)).

interference with another's use of neighboring or adjoining land. *Id.* (citations omitted).

"New Jersey courts have moved toward a strict liability theory with respect to environmental pollution cases and away from such common law claims as trespass and nuisance." *Rowe v. E.I. Dupont De Nemours and Co.*, 262 F.R.D. 451, 458-59 (D.N.J. 2009); *EPEC Polymers*, 2013 WL 2338711, at *13 (same); *see also Kenney v. Scientific, Inc.*, 204 N.J. Super. 228, 255–56 (1985) ("There is no need for us to be obsessed with labels, and to endeavor to torture old remedies to fit factual patterns not contemplated when these remedies were fashioned."); *see Virginia St. Fidelco*, Civ. No. 11-2057 (KM), 2016 WL 4150747, at *10-11 (D.N.J. Aug. 3, 2016) (granting summary judgment in favor of defendants as to claims of trespass and nuisance brought by successor landowners); *In re Paulsboro Derailment Cases*, Civ. Nos. 13-784, 12-7586, 13-410, 13-721, 13-761, 2013 WL 5530046, at *8 (D.N.J. Oct. 4, 2013) (dismissing trespass claim in part because "modern courts do not favor trespass claims for environmental pollution") (citing *Woodcliff, Inc. v. Jersey Const, Inc.*, 900 F. Supp. 2d 398, 402 (D.N.J. 2012)).

I agree with this reasoning. Antique intentional-tort theories, developed to address disputes between neighbors, serve only to encumber this environmental action. Plaintiff's claims of nuisance and trespass are dismissed as superfluous.

### III. Conclusion

For the reasons set forth above, I will **GRANT** in part and **DENY** in part Con Edison's motion to dismiss the second, fourth, fifth, and sixth counts of the amended third-party complaint. Because this is an initial dismissal, it is presumptively without prejudice to the filing of a properly supported motion to amend within 30 days.

An appropriate order follows.

Dated: January 28, 2019

**Kevin McNulty**
**United States District Judge**