UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **PUBLIC SERVICE ELECTRIC AND GAS COMPANY,** <br><br> Plaintiff, <br><br> v. <br><br> **NEWPORT ASSOCIATES DEVELOPMENT COMPANY, et al.,** <br><br> Defendants. | Civil Action No. 16-8445 (KM) <br><br> **OPINION AND ORDER** |
| **NEWPORT ASSOCIATES DEVELOPMENT COMPANY, et al.,** <br><br> Counterclaim and Third-Party Plaintiffs, <br><br> v. <br><br> **PUBLIC SERVICE ELECTRIC AND GAS COMPANY,** <br><br> Counterclaim Defendant, <br><br> -and- <br><br> **CONSOLIDATED EDISON COMPANY OF NEW YORK,** <br><br> Third-Party Defendant. | |
| **PUBLIC SERVICE ELECTRIC AND GAS COMPANY,** <br><br> Crossclaim Plaintiff, <br><br> v. <br><br> **CONSOLIDATED EDISON COMPANY OF NEW YORK,** <br><br> Crossclaim Defendant. | |

1

**CONSOLIDATED EDISON COMPANY OF NEW YORK,**

        **Counterclaim Plaintiff,**

   v.

**PUBLIC SERVICE ELECTRIC AND GAS COMPANY,**

        **Counterclaim Defendant.**

**CLARK, Magistrate Judge**

    **THIS MATTER** comes before the Court on a motion by Third-Party and Crossclaim Defendant and Counterclaim Plaintiff Consolidated Edison Company of New York, Inc. ("Con Edison") for the entry of a protective order preventing Defendants and Third-Party Plaintiffs Newport Associates and Development Company and Newport Associates Phase I Developers Limited Partnership (collectively "Newport") from obtaining certain discovery [Dkt. No. 145]. Newport opposes Con Edison's motion [Dkt. No. 157]. For the reasons set forth below, Con Edison's motion for a protective order is **GRANTED in part and DENIED in part.**

**I.   BACKGROUND[1]**

    **A. The Cables**

    Con Edison delivers electricity to approximately nine million people throughout a 604-square mile service area in New York. Dkt. No. 145-5, Declaration of Vernon Schaefer at ¶ 3. This electricity is transmitted and distributed, in part, through approximately 95,000 miles of underground cable. *Id.* There are two main types of cables that are insulated and cooled with a non-toxic synthetic oil called dielectric fluid. *Id.* at ¶ 6. The first type of cable is a "self-contained,

---

[1] As the parties are intimately familiar with the complex background of this matter, the Court recites only the facts relevant to the present motion.

fluid filled feeder" in which the fluid is self-contained within the feeder cable and is cooled by heat transfer to the surrounding environment. *Id.* The second type is a "high-pressure, fluid filled feeder" ("HPFF") which is highly pressurized and can be cooled with circulation through the pipe via an external cooling plant. *Id.* Con Edison owns 209 HPFF feeders that collectively span approximately 576 miles and collectively contain more than 8 million gallons of dielectric fluid. *Id.* at ¶ 6.

At issue in this matter is a pair of high-voltage transmission feeders known as the B3402 (the "B Line") and the C3403 (the "C Line") (collectively "the Cables"). *Id.* at ¶ 8. Plaintiff Public Service Electric and Gas Company ("PSE&G") and Con Edison (collectively "the Utilities") jointly own and operate the Cables. *Id.* at ¶ 9. The Cables, which are each approximately 7 miles long, connect Con Edison's Farragut substation in Brooklyn, New York to PSE&G's Hudson and Marion switchyards in New Jersey.[2] *Id.* Beginning in New Jersey, the Cables run underground in PSE&G's service area from the Hudson and Marion switchyards east to the Jersey City waterfront at the Newport Marina, then continue east, buried directly in the riverbed, across the Hudson River to Manhattan. *Id.* at ¶ 11. Next, the Cables run underground across Manhattan to the East River, then continue east through a utility tunnel that crosses under the East River into Brooklyn where they again run underground and extend to the Farragut substation. *Id.*

The Utilities were each responsible for constructing and maintaining the sections of the Cables in their respective service areas. *Id.* at ¶ 12. However, Con Edison was responsible for constructing the entire section of the Cables running underwater across the Hudson River ("the Hudson River Section"). *Id.* The steel pipes for the Cables were installed by Con Edison in a fifteen-foot deep trench dredged beneath the Hudson River in 1972. *Id.* at ¶¶ 13-14. The B Line

---

[2] The B Line connects to PSE&G's Hudson switchyard and the C Line connects to PSE&G's Marion switchyard.

was put into service in 1972 and the C Line was put into service in 1982. *Id.* at ¶ 13. The Hudson River Section is approximately 1 mile in length and extends from the Newport Marina in Jersey City to Pier 25 in Manhattan. *Id.* at ¶ 14. The sections of pipe which house the Cables as they cross the Hudson River Section in a S-shaped path are coated externally with coal tar wrap, encased in a one-inch-thick cement jacket, and joined by welded couplers. *Id.* at ¶ 15.

Although the Cables also cross the East River ("the East River Section"), the design and construction of the Hudson River Section differs significantly from that of the East River Section. *Id.* at ¶ 20. Rather than being buried in the riverbed, when the Cables cross the East River Section, they pass through a utility tunnel that existed at the time the Cables were installed. *Id.* Because the pipes in the East River Section run through the utility tunnel, they are constructed and maintained differently than those in the Hudson River Section, which are exposed to a marine environment. *Id.* at ¶ 20-21.

Newport owns the land in and around the Newport Marina in Jersey City, including the Sixth Street Pier ("the Pier"), and the underwater lands adjacent to the Pier. The Cables pass over Newport's portion of the riverbed. On January 1, 1987, Newport and PSE&G entered into an easement agreement ("the Easement"). The Easement runs parallel to the Pier and is approximately 30 feet wide.

### B. The Spill

On October 3, 2016, a leak of dielectric fluid into the Hudson River by the Newport Marina was discovered. PSE&G and Con Edison dispatched structural engineers, electrical engineers, and divers to the Newport Marina to investigate and repair the leak and clean the site. In mid-October 2016, divers discovered "enormous concrete segments, rip-rap, and other debris (including boulders, brick, and asphalt) resting on the riverbed within PSE&G's 30 foot-wide Easement area."

Dkt. No. 40, PSE&G Amended Complaint at ¶ 6. According to PSE&G, the debris discovered by the divers on the riverbed resulted from prior collapses of the Pier, which was "crumbling and dangerous." *Id.* at ¶¶ 1-2. On November 1, 2016, Newport informed the Utilities that it would not permit further work to investigate and repair the leak on the Pier or in the marina basin until engineers could agree to a pier stabilization plan. *Id.* at ¶ 26. On November 4, 2017, the United States Army Corp of Engineers issued a letter to Newport stating that it had been notified by the United States Coast Guard that portions of the Pier had eroded, which could result in further debris being discharged into the river, and ordering Newport to immediately carry out the removal of the debris and rehabilitate the stability of the Pier. *Id.* at ¶ 39. On November 10, 2016, the Coast Guard issued an order directing PSE&G to "utilize all necessary resources to locate and secure the source of the discharge," stop the leak, remove the fluid, and monitor the spill. *Id.* at Ex. 10.

On November 17, 2016, the Coast Guard issued an order to Newport directing it to "remove submerged debris on top of, and in the vicinity of, the [E]asement and adjacent pier structure to facilitate locating and securing the source of the discharge." *Id.* at Ex. 11. In late November, Newport submitted its proposed plans to "shore up" the Pier to Unified Command.[3] *Id.* at ¶ 44. Although Newport's initial stabilization plan was rejected due to concerns that Newport's proposed stabilization method would not allow for the removal of enough debris to allow access to the Cables, the parties eventually reached an agreement on a stabilization plan, and on March 21, 2017, the Cables were de-energized to permit Newport's contractors to begin to clear a portion of the Easement area. Dkt. No. 101, Con Edison Amended Counterclaims at ¶ 19.

---

[3] Unified Command is "an organization created to oversee and carry out emergency response efforts and includes representatives of PSE&G, Con Edison, Newport, the Coast Guard, and the New Jersey Department of Environmental Protection [DEP]." Dkt. No. 40, PSE&G Amended Complaint at ¶ 41, n.1.

In late May 2017, following Newport's partial clearing of the Easement area, the Cables were re-energized and the leak search and repair efforts were reinitiated. *Id.* at ¶ 22. The Cables were "systematically uncovered in the riverbed and exposed in 10-foot sections, and divers inspected each section looking for visual evidence of dielectric fluid emanating from [the Cables] or other damage." *Id.* at ¶ 23. The divers were unable to see any visual evidence of the leak and therefore unable to discover its location or source. *Id.* at ¶ 24. Between July 12 and July 17, 2017, the Cables were again de-energized and further tests were performed. *Id*. Based on the results of the tests, the B Line was identified as the likely source of the leak. *Id.* No problems with the C Line were identified. *Id.* On or about July 19, 2017, divers located the leak in the B Line. *Id.* at ¶ 25. The leak was located in a section of the B Line owned and operated by PSE&G in the Easement area in the Newport Marina. *Id.* On August 13, 2017, a permanent clamp was placed on the B Line to prevent any further leakage. *Id.* On or about January 11, 2018, PSE&G notified Con Edison that it intended to unilaterally retire the B Line and C Line. *Id.* at ¶ 28. Both the B Line and C Line have been out of service since mid-January 2018, and despite Con Edison's wishes to the contrary, PSE&G has not re-energized the Cables. *Id.* at ¶¶ 32-34.

The Utilities maintain that the leak was caused by Newport's failure to properly maintain the Pier. This failure, the Utilities allege, has resulted in "at least two catastrophic partial collapses" of the Pier in 2008 and 2009 and "caused over two hundred tons of concrete slabs and other debris to fall" onto the Cables. Dkt. No. 158, Con Edison Counterclaim at ¶ 3. The Utilities further claim that Newport improperly failed to disclose the "decrepit state" of the Pier which obstructed the Utilities' efforts to respond to the Spill, prolonging the discovery and repair of the leak, and resulting in an increased cost to the Utilities. *Id.*

Conversely, Newport claims that the leak was caused by the Cables' flawed design and the Utilities' "reckless" failure to maintain, repair, and protect the Cables since their installation. Dkt. No. 98, Newport Counterclaim and Third-Party Complaint at ¶ 3. Specifically, Newport alleges that the leak was caused by a welding flaw, known as a lack-of-fusion defect. *Id.* at ¶ 46. The allegedly defective weld is located on an irregularly-spaced coupler. *Id.* at ¶ 47. According to Newport, when the pipes for the Cables were installed, pairs of 20-foot segments of pipe were welded together to form 40-foot segments, and as a result, the pipes have regularly-spaced welds every 20 feet. *Id.* The defective weld, however, is one of three irregularly-spaced couplers, which were not included in the written plans for the Cables and appear to have been installed after a piece of pipe was "cut out" and replaced. *Id.* at ¶¶ 47-48. In addition to the irregularly-spaced coupler, Newport alleges that the Cables have inadequate pressure sensors which can only identify "extraordinarily large" leaks and claims that the Utilities failed to consistently install the 6-foot protective layer of crushed stone as required by the permits allowing for the construction and installation of the Cables. *Id.* at ¶¶ 28-29. As to the maintenance of the Cables, Newport claims the Cables have "significantly deteriorated" and that the Utilities have failed to properly carry out any regular maintenance or repairs. *Id.* at ¶¶ 38, 42.

Con Edison filed the present motion in response to what it claims are "wildly disproportionate" and irrelevant discovery requests served by Newport. Dkt. No. 145 at p. 1. Newport opposes Con Edison's motion and contends the "targeted discovery" it seeks is "highly relevant" to determining the cause of the leak. Dkt. No. 157 at p. 1.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 26 governs the scope of discovery in federal litigation and provides that:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). Rule 26 is to be construed liberally in favor of disclosure, as relevance is a broader inquiry at the discovery stage than at the trial stage. *Tele–Radio Sys. Ltd. v. De Forest Elecs., Inc.,* 92 F.R.D. 371, 375 (D.N.J. 1981). While relevant information need not be admissible at trial in order to grant disclosure, the burden remains on the party seeking discovery to "show that the information sought is relevant to the subject matter of the action and may lead to admissible evidence." *Caver v. City of Trenton*, 192 F.R.D. 154, 159 (D.N.J. 2000). Upon a finding of good cause, a court may order discovery of any matter relevant to a party's claims, defenses or the subject matter involved in the action. "Although the scope of discovery under the Federal Rules is unquestionably broad, this right is not unlimited and may be circumscribed." *Bayer AG v. Betachem, Inc.,* 173 F.3d 188, 191 (3d Cir. 1999).

Pursuant to Rule (26)(b)(2)(C), courts are required to limit discovery where:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

> (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Similarly, pursuant to Rule 26(c), "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.]" In moving for a protective order, the "burden of persuasion [is] on the party seeking the protective order." *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1121 (3d Cir. 1986). The party seeking a protective order "must show good cause by demonstrating a particular need for protection." *Id.* Establishing "good cause" requires the movant to "specifically demonstrate [ ] that disclosure will cause a clearly defined and serious injury. Broad allegations of harm, unsubstantiated by specific examples, however, will not suffice." *Glenmede Trust Co. v. Thompson,* 56 F.3d 476, 483 (3d Cir. 1995) (citing *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 786 (3d Cir. 1994)).

## III.   DISCUSSION[4]

The discovery requests at issue seek information falling into three broad categories: (1) information related to any leaks of dielectric fluid in Con Edison's facilities; (2) all documents concerning the Cables; and (3) all documents concerning a consent decree entered into in 1994 which resolved charges against Con Edison brought by the New York State Department of Environmental Conservation ("NYSDEC") for actions including alleged illegal discharges of dielectric fluid into the Hudson River ("the Consent Decree"). The Court will now address each category in turn.

---

[4] The Court notes that Newport's opposition to the present motion includes references to prior filings made by PSE&G in this matter regarding discovery disputes and requests that the Court now compel PSE&G to provide certain information. As PSE&G has not moved for a protective order and there is no pending motion by Newport to compel PSE&G to provide any discovery, any request by Newport for the entry of an order compelling PSE&G to provide discovery is outside the scope of the present motion and is therefore denied.

## A. Information Related to Leaks of Dielectric Fluid ("Category A")[5]

Newport requests from Con Edison documents and information detailing every leak of dielectric fluid from any Con Edison facility, with the exception of leaks originating from self-contained fluid-filled cables, without any geographic or temporal limitations.[6] Con Edison contends that Newport's requests "shatter[] the bounds of proportionality under Rule 26" and lack any nexus to Newport's claims in this matter that the leak was caused by a defective weld. Dkt. No. 145 at p. 10. Con Edison further claims that due to the sheer scale of its operations and size of its system, responding to Newport's requests in this Category would impose a significant burden on Con Edison. As a compromise, Con Edison suggests that Newport's request be limited to only leaks involving welded couplers and HPFF submarine cables.

In response, Newport claims that its requests are directly relevant to the leak at issue in this matter and that discovery detailing all other leaks within Con Edison's system will likely "shed light on the leak-prone nature of the Cables…; the circumstances in which this type of cable leaks; the Utilities' awareness of the risks of leaks; and the likely resultant harm." Dkt. No. 157 at p. 14. Newport takes issue with Con Edison's proposed limitations, arguing that its allegations with respect to design flaw and lack of proper maintenance of the Cables apply equally to submarine and terrestrial cables and that while the alleged welding flaw is "one of Newport's theories for what caused the leak, it is not Newport's only theory." *Id.* at p. 19. Finally, Newport maintains that

---

[5] There are two specific discovery requests at issue in this Category. The first is Newport's Interrogatory No. 5, which requires Con Edison to "[d]escribe each incident, other than [the Spill], in which a facility owned or operated by Con Edison has discharged dielectric fluid into the environment, including the date of the incident, the facility involved, the amount of dielectric fluid discharged, and the cause of the discharge." Dkt. No. 145, Declaration of Kevin T. Sullivan, Ex. A at p. 5. The Second is Newport's Request for Production No. 8, which requires Con Edison to provide "[a]ll documents concerning any other discharge of dielectric fluid from any other facility" owned or operated by Con Edison other than the Cables. *Id.* at p. 4.

[6] Although Newport's discovery requests do not exclude leaks originating from self-contained fluid-filled cables, upon consideration of Con Edison's arguments, Newport has agreed to such a limitation. *See* Dkt. No. 157 at p. 13, n. 2.

Con Edison has failed to articulate any burden it would suffer as a result of producing the requested information, and that even in the event Con Edison could make such a showing, that burden would not be disproportionate to the stakes of this case or the resources of the parties.

It is clear to the Court that Newport's requests in this Category are outside the bounds of discovery permitted under Rule 26. Although Newport is correct in its argument that the stakes of this case are high and the resources of the parties are vast, Newport has made no attempt to limit its discovery requests to what is relevant to the allegations in this matter. According to Newport's pleading, "[t]he evidence is unequivocal that [the] leak was caused by a welding defect . . . which may have been worsened over time by the ordinary operation of the Cables." Dkt. No. 98, Newport Counterclaim and Third-Party Complaint at ¶ 46. Rather than seeking information relevant to its claims, Newport's request for information detailing every leak from Con Edison's incredibly vast network of cables without limitation appears to be an impermissible fishing expedition attempting to uncover additional arguments to be made as to why the Utilities are ultimately responsible for the Spill. This type of inquiry is not permitted under Rule 26. *See Claude P. Bamberger Intern., Inc. v. Rohm and Haas Co.,* C.A. No. 96–1041(WGB), 1998 WL 684263, at *2 (D.N.J. April 1, 1998) ("while the standard of relevancy is a liberal one, it is not so liberal as to allow a party to roam in shadow zones of relevancy and to explore matter which does not appear germane merely on the theory that it might become so.").

Although the Court finds that Newport's discovery requests in this Category do not comport with Rule 26, which entitles Con Edison to some level of protection, the Court declines to accept Con Edison's proposed to limit this Category of discovery to leaks involving welded couplers and HPFF submarine cables. While the Court agrees with Con Edison that discovery in this Category should be limited to leaks involving welded couplers and HPFF cables, the Court

also agrees with Newport that Con Edison has failed to demonstrate that the submarine condition of the Cables renders discovery as to leaks involving terrestrial HPFF cables and welded couplers irrelevant to Newport's claims. Accordingly, Con Edison's request for a protective order in this Category is GRANTED in part and the Court will limit Newport's inquiries to leaks involving HPFF cables and welded couplers.

### B. Documents Related to the B Line and C Line ("Category B")[7]

In this Category, Newport makes a wholesale request for all documents concerning the B Line and C Line without limitation. Con Edison, citing the unique underwater location and conditions of the Cables as they cross the Hudson River, argues that that discovery sought in this Category should be limited to the Hudson River Section of the Cables. According to Con Edison, discovery related to the B Line and C Line beyond the Hudson River Section is irrelevant because it is the only span of the Cables which is buried directly into the riverbed and is therefore unique in its design, construction, and maintenance. Because of the unique nature of the Hudson River Section of the Cables, Con Edison maintains that discovery regarding the remainder of the Cables has no bearing on Newport's claims as to the alleged defects which caused the leak.

In response, Newport claims that discovery as to the entirety of the Cables is relevant and necessary because "the [C]ables are an interconnected system and were designed, installed, and maintained as such." Dkt. No. 157 at p. 25. Accordingly, Newport argues that "[o]ther leaks or other failures anywhere on the Cables" could have caused the leak at issue in this matter and could result in future leaks. *Id.* Newport further claims that discovery into the entirety of the Cables is necessary to determine whether the Cables are under the possession and control of Con Edison or PSE&G.

---

[7] This Category, as set forth in Newport's Request for Production No. 2, seeks "[a]ll documents concerning the Cables" and lists 27 separate subcategories of documents. Dkt. No. 145, Sullivan Decl., Ex. A at p. 1-4.

The Court agrees with Con Edison that the extensive documentation sought by Newport as to the Cables beyond the Hudson River Section bears little to no relevance to the claims and issues in this matter and that its production would significantly and disproportionately burden Con Edison. This action arises out a discrete leak of dielectric fluid from the B Line in the Hudson River Section of the Cables. The Court fails to understand how information related to sections of the Cables which were designed, constructed, and maintained in a completely different fashion than the section in which the leak at issue occurred will aid the parties and the Court in making a determination as to what caused the leak and which party ultimately bears responsibility. As an example, the Court turns to Newport's request for documents concerning the "manufacture or construction of the Cables or any of their Components." Dkt. No. 145, Sullivan Decl., Ex. A at p. 1. Documents relating to the "components" of sections of the Cables and surrounding infrastructure beyond the Hudson River Section, such as the East River Section of the Cables, which are installed in a utility tunnel, are not encased in cement jackets or coated in coal tar wrap, and are not joined by welded couplers, would be wholly irrelevant to Newport's allegations regarding the cause of the leak at issue. Furthermore, the Court notes that Newport will receive information regarding any previous relevant leaks on the remainder of the Cables in connection with its requests set forth in the previous Category.

Turning to Newport's contention that such discovery is necessary to determine whether Con Edison or PSE&G is in actual possession or control of the Cables, it appears to the Court that the relevant inquiry is which party is in possession and control of the section of the Cables in which the leak occurred. The limitation of Newport's request to documents related to the Hudson River Section of the Cables will in no way diminish Con Edison's responsibility to provide

documentation regarding the possession and control of the Cables at the location of the leak, which occurred in the Hudson River Section.

Based upon the foregoing, the Court finds that the discovery sought by Newport in this Category falls outside the scope of permissible discovery under Rule 26. Accordingly, Con Edison's motion for a protective order is GRANTED in part as to this Category and Con Edison will be only be required to produce the requested information as to the Hudson River Section of the Cables.

### C. Documents Related to the Consent Decree ("Category C")[8]

On June 5, 1992, NYSDEC filed a complaint against Con Edison (the "NYSDEC Complaint"). Dkt. No. 157, Declaration of Adam Bernstein at Ex. 2.[9] According to Newport, the NYSDEC Complaint charged Con Edison with 319 violations dating from 1984 to 1992, "including both illegal discharges [of dielectric fluid] and deceptive non-disclosure of such discharges." Dkt. No. 157 at p. 9. In 1994, the charges against Con Edison were resolved by the entry of the Consent Decree. Dkt. No. 157, Bernstein Decl. at Ex. 3. As part of the Consent Decree, Con Edison agreed to pay a fine, consent to a "comprehensive environmental audit," and adopt "best management practices." *Id.* Appendix D of the Consent Decree required Con Edison to:

> implement best management practices with respect to the operation, inspection, maintenance and replacement of its dielectric fluid filled transmission line system . . . [to] include, but not be limited to, a system performance objective of minimizing leaks and, in the event of a leak, to rapidly detect the leak and determine its location and to take all reasonable and necessary measures to control the leak upon its discovery.

---

[8] This Category, as set forth in Newport's Request for Production No. 12, seeks "[a]ll [d]ocuments concerning the Consent Decree, including: (a) [c]ommunications with PSE&G concerning the Consent Decree; (b) all [d]ocuments concerning [Con Edison's] compliance including Appendix D concerning dielectric di-electric cables; and (c) all [d]ocuments concerning the discharges and false filings described in the NYSDEC Consent Decree and NYSDEC Complaint." Dkt. No. 145, Sullivan Decl., Ex. A at p. 4.
[9] Newport has only provided the Court with excerpts of the NYSDEC Complaint.

14

*Id.* at Appx. D, ¶ A. According to Con Edison, its obligations under the Consent Decree with respect to the B Line and C Line were "satisfied and closed out in 1999 . . . ." Dkt. No 145 at p. 3.

In support of its motion, Con Edison argues that the requested documents have no connection to any claim or defense in this matter and that Newport's request for this information "seeks only to manufacture a distracting slideshow that will burden the parties and this Court." *Id.* at p. 21. According to Con Edison, Newport's request is overly broad and disproportionate to the needs of the case, especially as none of the issues "alleged" in the Consent Decree "involved the B or C Lines in the Newport Marina." *Id.* Con Edison further contends that the only relevant information under Appendix D relates to the required "best management practices" for the operation, inspection, maintenance and replacement of its dielectric fluid lines, which Con Edison will already be producing to Newport as to the Hudson River Section of the Cables in response Newport's Request for Production No. 2. *Id.* at p. 22-23. Finally, Con Edison claims that the installation of full stop joints on river crossings, which can be activated to isolate the dielectric fluid in a section of cable in the event of a leak, was the only structural improvement required in Appendix D of the Consent Decree and was completed on the Cables in 1999. *Id.* at p. 23.

In opposition, Newport claims that leaks of dielectric fluid from Con Edison's cables and Con Edison's concealment of such leaks were "focuses" of the NYSDEC Complaint and that the underlying documents relating to the NYSDEC Complaint and Consent Decree are "important to understanding Con Edison's environmental controls and leak history during the period preceding the alleged pier collapses." Dkt. No. 157 at p. 5. As to its request for documents concerning Con Edison's compliance with Appendix D of the Consent Decree, Newport claims that such information will shed light on the "applicable standard of care" for the Cables and demonstrate whether Con Edison complied with that standard. *Id.* at p. 23.

The Court will first address Newport's request for documents related to the NYSDEC Complaint and the claims set forth therein. Despite Newport's assertions to the contrary, the Court agrees with Con Edison and finds that Newport's wide-ranging and intrusive request seeks information that is largely irrelevant to the claims in this matter. Newport's central justification for its request is that such information will shed light on previous leaks of dielectric fluid, which the Court does not dispute are indeed relevant to this matter. However, because Con Edison will be required to provide Newport with documentation regarding every relevant leak of dielectric fluid dating back to the installation of the Cables, Newport's request for the same information in connection with the NYSDEC Complaint is impermissibly duplicative under Rule 26.

The Court is likewise unconvinced by Newport's assertion that Con Edison would suffer no burden as a result of the requested production because "re-producing documents already collected and reviewed in another matter cannot be burdensome." Dkt. No. 157 at p. 22 (citing *In re Plastics Additives Antitrust Litig.*, 2004 WL 2743591, at *12 (E.D. Pa. Nov. 29, 2004). While the burden may indeed be minimal were Newport requesting only documents produced in connection with the NYSDEC Complaint, Newport's request extends far beyond such documents and seeks extensive information that has likely not been previously identified, collected or sorted by Con Edison, such as communications with PSE&G and NYSDEC. Based on the foregoing, the Court finds that Newport's requests for the underlying documents related to the NYSDEC Complaint are beyond the scope of discovery permitted under Rule 26 and Con Edison's request for a protective order as to documents related to the NYSDEC Complaint is GRANTED.

The Court now turns to Newport's request for documents concerning Con Edison's compliance with Appendix D of the Consent Decree. The Court agrees with Newport that documentation identifying the "best management practices" for Con Edison's dielectric cables

developed in connection with the Consent Decree and demonstrating Con Edison's compliance, or lack thereof, with such practices is indeed relevant to Newport's claims that the leak was caused by Con Edison's failure to properly maintain its cables. However, the Court does not agree with Newport's contention that a system-wide examination of Con Edison's practices and the application of those practices is relevant to this case. While Newport claims it requires such information for Con Edison's entire system, because this case arises out one specific leak of dielectric fluid in a distinct section of the Cables, the relevant inquiry extends only as far as documents related Con Edison's practices and maintenance for the section of the Cables in which the leak at issue occurred. Accordingly, Con Edison's motion for a protective order as to Newport's request for documents related to Con Edison's compliance with Appendix D of the Consent Decree is **GRANTED** in part and the Court will limit Newport's inquiry to documents detailing such compliance with respect to the Hudson River Section of the Cables.

### IV.    CONCLUSION AND ORDER

The Court having considered the papers submitted pursuant to Fed. R. Civ. P. 78, and for the reasons set forth above;

**IT IS** on this 26th day of August, 2019,

**ORDERED** that Con Edison's motion for a protective order [Dkt. No. 145] is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that the discovery sought in Category A shall be limited to leaks of dielectric fluid involving HPFF cables and welded couplers; and it is further

**ORDERED** that the discovery sought in Category B shall be limited to documents related to the Hudson River Section of the Cables; and it is further

**ORDERED** that the discovery sought in Category C shall be limited to documents related to Con Edison's compliance with Appendix D of the Consent Decree as to the Hudson River Section of the Cables; and it is further

**ORDERED** that this Opinion and Order shall remain under seal for fourteen (14) days during which time the parties may file a motion or motions to seal portions of this Opinion and Order pursuant to Local Civil Rule 5.3.

                                                   s/ James B. Clark, III
                                                 **JAMES B. CLARK, III**
                                                 **United States Magistrate Judge**