Lawrence S. Lustberg
Thomas R. Valen
Kate E. Janukowicz
Marquis A. Whitney
Mary K. Bessemer
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07030
*Attorneys for Public Service Electric & Gas Co.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PUBLIC SERVICE ELECTRIC AND GAS COMPANY,<br><div align=center>Plaintiff,</div><div align=center>v.</div>NEWPORT ASSOCIATES DEVELOPMENT COMPANY and NEWPORT ASSOCIATES PHASE I DEVELOPERS LIMITED PARTNERSHIP,<br><div align=center>Defendants.</div> | **Civil Action No. 16-08445**<br><br>**Hon. Kevin McNulty, U.S.D.J.**<br>**Hon. James B. Clark, U.S.M.J.**<br><br>***Document Electronically Filed*** |
| NEWPORT ASSOCIATES DEVELOPMENT COMPANY and NEWPORT ASSOCIATES PHASE I DEVELOPERS LIMITED PARTNERSHIP,<br><div align=center>Counterclaim &  Third-<br>Party Plaintiffs,</div><div align=center>v.</div>PUBLIC SERVICE ELECTRIC AND GAS COMPANY,<br><div align=center>Counterclaim Defendant,</div><div align=center>-  and -</div>CONSOLIDATED EDISON COMPANY OF NEW YORK,<br><div align=center>Third-Party Defendant.</div> | |
| PUBLIC SERVICE ELECTRIC AND GAS COMPANY,<br><div align=center>Crossclaim Plaintiff,</div><div align=center>v.</div>CONSOLIDATED EDISON COMPANY OF NEW YORK,<br><div align=center>Crossclaim Defendant.</div> | **SECOND AMENDED COMPLAINT AND AMENDED CROSSCLAIMS** |
| CONSOLIDATED EDISON COMPANY OF NEW YORK,<br><div align=center>Counterclaim Plaintiff,</div><div align=center>v.</div>PUBLIC SERVICE ELECTRIC AND GAS COMPANY,<br><div align=center>Counterclaim Defendant.</div> | |

## SECOND AMENDED COMPLAINT AGAINST NEWPORT DEFENDANTS

Plaintiff Public Service Electric and Gas Company ("PSE&G" or "Plaintiff"), by and through its undersigned counsel, for its Second Amended Complaint against Defendants Newport Associates Development Company and Newport Associates Phase I Developers Limited Partnership (collectively, "Newport") alleges as follows:

### Nature of the Action

1.     For years defendant Newport recklessly disregarded the state of its crumbling and dangerous Sixth Street Pier—upon information and belief, even in the face of due warnings of grave consequences from the engineering firm that it hired, and fired, for advice. Newport's malfeasance included intentional decisions not only to ignore the precarious deterioration of the Pier, but also to conceal its true condition.

2.     These actions caused over two hundred tons of concrete slabs and debris to fall onto underwater electrical cables owned by PSE&G and Con Edison, cables that carry critical electricity to New York City from New Jersey through an easement on Newport's underwater seabed. Not surprisingly, the cables were badly damaged by Newport's slabs and debris, causing a leak of dielectric fluid into the Hudson Bay at Newport Marina.

3.     PSE&G brings this action to remedy the damage caused by Newport's reckless and intentional malfeasance. In particular, PSE&G seeks damages for costs incurred in connection with PSE&G's response to the leak and repair of the cables, declaratory relief with respect to its rights and obligations under the easement and under federal and state statutes, and injunctive relief compelling Newport to continue its efforts to remedy the harm it has caused.

## The Parties

4.      Plaintiff PSE&G is a New Jersey corporation with its principal place of business located at 80 Park Plaza, Newark, New Jersey.

5.      Defendant Newport Associates Development Company is a New Jersey general partnership with its principal place of business located at 111 Town Square Place, Suite 1505, Jersey City, New Jersey 07310.

6.      Defendant Newport Associates Phase I Developers Limited Partnership is a New Jersey limited partnership. Upon information and belief, its principal place of business is located at 111 Town Square Place, Suite 1505, Jersey City, New Jersey 07310.

7.      Defendants Newport Associates Development Company and Newport Associates Phase I Developers Limited Partnership are both companies within the LeFrak Organization, Inc., one of the largest real estate development companies in the New Jersey and New York areas.

## Jurisdiction and Venue

8.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1333, 33 U.S.C. § 2717(b), and 42 U.S.C. § 9613(b). PSE&G has asserted claims for relief that arise under the Oil Pollution Act of 1990 ("OPA90"), 33 U.S.C. § 2701 *et seq* and under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq*. Accordingly, this Court has jurisdiction under 28 U.S.C. § 1331, 33 U.S.C. § 2717(b), and 42 U.S.C. § 9613(b). This case also involves activity that occurred on the navigable waters and that has a connection with maritime activity, thus coming within the maritime jurisdiction of this Court pursuant to 28 U.S.C. § 1333.

9.      PSE&G's state law claims arise out of the same case or controversy as its federal law claims, as all claims in this action arise out of a common nucleus of operative facts. Thus, this Court also has supplemental jurisdiction over PSE&G's state law claims under 28 U.S.C. § 1367.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2), 33 U.S.C. § 2717(b), and 42 U.S.C. § 9613(b) because both parties reside in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## Factual Background

**A.      Newport Grants PSE&G an Easement to Use Newport Property North of Newport's Sixth Street Pier for Submerged Electrical Cables.**

11.     Newport owns land in and around the Newport Marina in Jersey City, New Jersey, including the Sixth Street Pier and the underwater lands adjacent to the pier. PSE&G possesses a right-of-way on Newport's underwater land north of the Sixth Street Pier pursuant to a "permanent thirty (30) foot wide non-exclusive subsurface easement" that Newport granted to PSE&G, dated January 1, 1987 (the "Easement"). Ex. 1 [*See* ECF No. 40-1].

12.     PSE&G and Con Edison jointly own two high-voltage electric cables that are installed in Newport's underwater land north of the Sixth Street Pier, within the area covered by the Easement. The Cables were installed in the Easement area at varying depths below the riverbed, run the width of the Hudson River into New York, and transmit electrical power between New Jersey and New York City.

13.     The Easement grants PSE&G a right-of-way to inspect, operate, and repair the Cables, among other rights and privileges, within the 30 foot-wide easement area:

> [NADC] . . . do[es] hereby grant unto [PSE&G] . . . a permanent thirty (30) foot wide non-exclusive subsurface easement as a right-of-way, with all the rights and privileges herein granted,

4

> for the purpose of constructing, reconstructing, operating, inspecting, repairing, protecting, removing, replacing, relaying and maintaining perpetually thereon a maximum of three (3) underground lines for transmitting electrical energy, together with manholes, one (1) above ground pad rectifier, all necessary fittings, signs, appurtenances, and facilities, in, under, along, through and across said right-of-way being situate in the City of Jersey City, County of Hudson and State of New Jersey . . . .

Ex. 1.

14.     The Easement provides that Newport reserves the right to install, maintain, repair, and replace improvements on its property, subject to the limitation that Newport must not unduly interfere with PSE&G's ability to maintain and repair its cables:

> [Newport] reserve[s] the right to install, maintain, repair and replace any such improvements they may own within the Premises . . . *as will not unduly interfere with [PSE&G's] use of the Premises as set forth herein*. In the event of construction of substantial improvements within the Premises, [Newport] shall have the option of (a) notifying [PSE&G] of such improvements, at which time [PSE&G] shall move its cables at [Newport's] expense, or (b) [Newport] shall provide sufficient access for [PSE&G's] use of the Premises which shall not unduly interfere with [PSE&G's] ability to maintain and repair its cables. . . .

Ex. 1 ¶ 6 (emphasis added).

15.     The Easement also includes an indemnification provision; however, the indemnification provision by its express terms does not apply in cases of harm resulting from Newport's negligence:

> [PSE&G] hereby agrees to indemnify and hold [Newport] harmless from and against any and all liabilities, losses, damages, claims, demands, actions, suits, judgments, charges, costs or expenses, including, without limitation, attorneys' fees and disbursements (including, without limitation, those incurred in enforcing this indemnity) arising from, out of or incident to the following regardless of fault, *unless arising from [Newport's] negligence*: (i) The grant of this easement and [PSE&G's] exercise or failure to exercise any rights granted herein; (ii) [PSE&G's] failure to fulfill any of its obligations under this Agreement; (iii) [PSE&G's] use or occupancy of the Premises whether pursuant to the terms hereof or otherwise; and (iv) All damage to property or injury and/or death

to persons occurring on the Premises or by reason of, incident to or
in connection with the easement herein granted.

Ex. 1 ¶ 13 (emphasis added).

**B.    PSE&G and Con Edison Respond Immediately to a Reported Fluid Leak
in the Newport Marina in October 2016.**

16.    In or around October 3, 2016, a possible leak was reported in the Newport
Marina area.

17.    It was determined that the leak originated from one or more of the Cables,
which are encased in a thick protective barrier. The leak consisted of dielectric fluid—a synthetic
oil used *inter alia* to insulate, cool, and protect the Cables against corrosion.

18.    PSE&G and Con Edison immediately launched emergency efforts.
Among other things, structural engineers, electrical engineers, and divers were dispatched to the
Newport Marina to investigate and repair the leak, and to clean the site.

19.    On October 6, 2016, the United States Coast Guard notified PSE&G that
PSE&G may be a "responsible party" under the Oil Pollution Act of 1990 ("OPA90") and
potentially was liable for "among other things, removal costs and damages resulting from this
incident." Ex. 2 [*See* ECF No. 40-2].

20.    The same day, the United States Coast Guard issued a Notice of Federal
Interest of an oil pollution incident to Newport.

21.    Also on October 6, 2016, the New Jersey Department of Environmental
Protection ("NJDEP") issued a Field Directive to PSE&G to, among other things, "[l]ocate and
terminate discharge from transmission line into Hudson River," and "[c]ontain and recover oil
discharge in Newport Marina (Hudson River)." Ex. 3 [*See* ECF No. 40-3].

**C.      Newport's Concrete Slabs and Debris Obstruct Emergency Efforts to Repair the Leak.**

22.      Starting in or around mid-October 2016, divers discovered enormous concrete segments, rip-rap, and other debris (including boulders, brick, and asphalt) that were resting on the riverbed within PSE&G's 30 foot-wide Easement area. At present, the largest known segment of concrete is estimated to weigh about 35 tons, but the investigation is ongoing. In total, the concrete currently is estimated to weigh at least 200 tons.

23.      The figure below illustrates the approximate locations of the first concrete segments that have been excavated and uncovered in the Easement area:



Sonographic and bathymetric imaging of the Easement area shows that additional concrete segments extend along the full length of pier, where PSE&G's Easement is located.

24.      Upon information and belief, Newport—through its reckless indifference as well as through its deliberate and informed decisions not to maintain and shore up its crumbling and dangerous pier—caused nearly two hundred tons of concrete segments and other debris to fall into the Easement area, and onto the riverbed on top of the Cables.

25.      Portions of the northern seawall of the Sixth Street Pier owned by Newport have collapsed at least twice in the past eight years, in 2008 and in 2009. Upon information and belief, these collapses, in addition to other potential collapses and activities conducted by Newport on the Sixth Street Pier, caused concrete segments and debris to fall off of the Sixth Street Pier, into the Easement area, and onto the riverbed on top of the Cables.

26.      Newport has acknowledged that the concrete segments and at least some of the debris in the Easement area are the result of collapses of the Sixth Street Pier. On October 18, 2016, PSE&G notified Newport that "due to multiple collapses of Newport's adjacent [Sixth Street] pier, large concrete segments and other debris, including boulders, concrete, brick and asphalt, are located on top of the [electric] feeder cables." Ex. 4 [*See* ECF No. 40-4]. To date, Newport has never denied that the multi-ton concrete segments discovered underwater in the Easement area got there as a result of collapses of the Sixth Street Pier.

27.      In addition, upon information and belief, Newport intentionally or negligently caused additional debris to be pushed, dropped, or otherwise placed into the Easement area, and onto the riverbed above the Cables, potentially as part of an effort to stabilize the Sixth Street Pier. Indeed, debris removed from the water is identical to the debris currently stacked neatly around the Sixth Street Pier.

28.      Upon information and belief, Newport was aware of the hazardous state of the Sixth Street Pier by at least September 2008. In 2008 and 2009, Newport retained the McLaren Engineering Group ("McLaren") to investigate collapses of its pier. Upon information and belief, McLaren made recommendations to Newport about how to minimize the safety risks presented by the pier's compromised state; however, Newport failed to act in accordance with McLaren's recommendations.

29. Upon information and belief, Newport was warned repeatedly that further collapse of the pier could be expected, and that the pier's condition posed an imminent danger to the public.

30. Upon information and belief, during this time, Newport failed to inform PSE&G of the 2008 and 2009 pier collapses or of the warnings it had received, notwithstanding the fact that Newport was aware of the Easement and the presence of high-voltage electric cables directly below the crumbling pier.

31. Even now, Newport continues to conceal information about its past attempts to stabilize the Sixth Street Pier. For example, in October 2016, after Con Edison retained McLaren to analyze the stability of the sheet piling system around the Sixth Street Pier as it related to Con Edison's work to locate and repair the leak, Newport wrote to McLaren objecting to its representation of Con Edison on the ground that in 2008 and 2009, Newport retained McLaren to stabilize the pier as a result of the two pier collapses, which Newport argued represented "a clear conflict of interest." Ex. 5 [*See* ECF No. 40-5]. Newport insisted that McLaren resign from the engagement "at once." *Id.*

32. McLaren responded that it was currently not under contract with Newport for any ongoing work and that it intended to fulfill its obligations to Con Edison. Ex. 6 [*See* ECF No. 40-6]. Afterward, Newport sent a response advising McLaren that its employees, agents, and contractors would not be permitted to access Newport's property "for any purpose whatsoever and if McLaren or its Agents access said property they will be removed by security." Ex. 7 [*See* ECF No. 40-7].

33.     Upon information and belief, Newport objected to McLaren's representation of Con Edison because it wanted to prevent McLaren from sharing information or knowledge regarding Newport's past attempts to stabilize the Sixth Street Pier.

34.     The continued presence of the concrete segments and other debris not only prevents the inspection and repair of the Cables, but also causes additional damage to the Cables and the surrounding area.

**D.     Newport Prohibits Further Efforts to Investigate and Stop the Leak.**

35.     During the course of PSE&G's and Con Edison's emergency response, significant questions arose concerning the stability of Newport's Sixth Street Pier. For example, in addition to the two pier collapses confirmed by Newport, emergency workers noticed that the berm on the pier was cracked, and that the crack was expanding. In addition, a bowing of the sheet wall was identified.

36.     On November 1, 2016, Newport's outside counsel informed PSE&G and Con Edison that "no further work will be permitted on the Sixth Street Pier or in the Marina Basin" until engineers could agree to a pier-stabilization plan and the parties could agree to a long-term access agreement for the continued use of Newport's property. Ex. 8 [*See* ECF No. 40-8].

37.     In response, PSE&G and Con Edison advised Newport that they "must continue the on-water oil recovery operations to protect the environment in accordance with governmental orders," but that all other operations would cease in accordance with Newport's demand, which "has the effect of hampering and delaying the investigatory and repair efforts." *Id.*

38.     Newport continued to block efforts to access, to locate, and to stop the leak. In response to PSE&G and Con Edison, Newport stated that while on-water fluid recovery efforts could continue, "all other activities such as removing concrete and debris from the subsurface, taking borings through the pier and filling in fissures in the berm have got to cease." *Id*.

**E.      The U.S. Coast Guard Army Corps of Engineers Issue Orders Directing Parties to Take Action.**

39.     On November 4, the U.S. Army Corps of Engineers issued a letter to Newport stating that it had been notified by the U.S. Coast Guard that portions of the north side of the Sixth Street Pier had eroded "and that an earthen berm is currently situated along the north side of the Sixth Street Pier, which could give rise to further unacceptable discharges of large amounts of materials into the river . . ." Ex. 9 [*See* ECF No. 40-9]. The letter ordered Newport to "immediately carry out the removal of the eroded Sixth Street Pier debris from the water way along its north side, and rehabilitate the stability of the pier to ensure future discharges to the waterway do not occur from eroded portions of the pier." *Id.*

40.     On November 10, the Coast Guard issued an order directing PSE&G to undertake several enumerated actions to remediate the leak by December 1, 2016. Ex. 10 [*See* ECF No. 40-10].

41.     On November 17, the Coast Guard issued an order to Newport directing it, among other things, to "[t]ake all necessary actions to coordinate with the Unified Command[1] and remove submerged debris on top of, and in the vicinity of, the easement and adjacent pier structure to facilitate locating and securing the source of discharge." Ex. 11 [*See* ECF No. 40-11].

---

[1] Unified Command is an organization created to oversee and carry out emergency response efforts and includes representatives of PSE&G, Con Edison, Newport, the Coast Guard, and the New Jersey Department of Environmental Protection.

The order further notes that "[u]nder the Oil Pollution Act of 1990, the responsible party is liable for, among other things, removal costs and damages resulting from this condition. The failure or refusal to comply with this Administrative Order will eliminate any defense or entitlement to limited liability, which might otherwise be available under the Act (33 U.S.C. §§ 2701-2762)." *Id.*

42.     On November 25, the Coast Guard issued an amendment to its November 17 order to Newport. Ex. 12 [*See* ECF No. 40-12]. The amendment orders Newport, among other things, to "[r]emove from the waterway on the north side of the Sixth Street Pier all rip-rap and pier debris obstructing the underwater electric transmission line." *Id.* The amendment also states that the "purpose of this particular action is the removal of obstructions to the underwater electric transmission line so the source of the oil discharge can be located and secured." *Id.*

**F.     Newport Refuses to Install Support System Sufficient to Allow PSE&G and Con Ed to Inspect and Repair Cables.**

43.     In late November, in response to the Coast Guard's orders, Newport was forced to agree to take action to attempt to shore up the Sixth Street Pier and to remove the debris from PSE&G's easement area. *See* Dkt. No. 24.[2]

44.     Shortly thereafter, Newport submitted its proposed plans to shore up the Sixth Street Pier to Unified Command. After reviewing the plans, members of the Unified Command expressed concerns because Newport proposed installing an in-board piling support system to secure the bulkhead of the pier, despite the fact that Newport itself acknowledged that the in-board support system would be insufficient to clear enough of the submerged concrete and debris to allow PSE&G and Con Edison to examine the cables and identify the source of the leak.

---

[2] Prior to this time, Newport had refused to remove the concrete and debris from the easement area.

45.     On December 15, Newport submitted a draft "Decision Memo" to members of Con Edison, PSE&G, the Coast Guard, and the New Jersey Department of Environmental Protection. *See* Ex. 13 [*See* ECF No. 40-13]. In the Decision Memo, Newport acknowledged that the implementation of a king pile support system would allow Con Edison and PSE&G to examine the feeder cables and identify the source of the leak. However, because a king pile system would be more costly than an in-board system, Newport asserted that it would perform this work "under protest" and requested that Con Edison and PSE&G indemnify it for any potential damage resulting from the installation of the king pile system, including any necessary excavation.

46.     PSE&G and Con Edison refused to indemnify Newport on the ground, *inter alia*, that Newport is already obligated to install a support system sufficient to allow the leak to be located and repaired pursuant to the Coast Guard's November 17 and 25 Orders.

47.     In the following weeks, PSE&G, Con Edison, and Newport met and conferred regarding the installation of a king pile system and exchanged several drafts of the Decision Memo. Ultimately, the parties could not come to agreement; the Decision Memo was never signed.

48.     Newport has since indicated that it intends to install a king pile system to secure the bulkhead, without waiver of its right to seek indemnification or contribution from PSE&G for costs associated with the installation. Indeed, Newport continues to assert that installation of a king pile system or other support system more substantial than its proposed in-board system is not required by the Coast Guard's November 17 and 25 Orders.

49.     Upon information and belief, Newport recently began the process of installing the piles.

50. At present, on-water activities to clean up dielectric fluid that has leaked into the Hudson River continue.

51. The concrete segments and other debris remain on the riverbed above the Cables, and it is impossible to access, inspect, or repair the Cables.

### COUNT I
### A Declaration of Rights and Obligations Under Easement

52. PSE&G repeats each of the foregoing allegations as though fully set forth.

53. The Easement grants PSE&G a right-of-way to inspect, operate, and repair the Cables, among other rights and privileges, within the 30 foot-wide easement area:

> [Newport] . . . do[es] hereby grant unto [PSE&G] . . . a permanent thirty (30) foot wide non-exclusive subsurface easement as a right-of-way, with all the rights and privileges herein granted, for the purpose of constructing, reconstructing, operating, inspecting, repairing, protecting, removing, replacing, relaying and maintaining perpetually thereon a maximum of three (3) underground lines for transmitting electrical energy, together with manholes, one (1) above ground pad rectifier, all necessary fittings, signs, appurtenances, and facilities, in, under, along, through and across said right-of-way being situate in the City of Jersey City, County of Hudson and State of New Jersey . . . .

Ex. 1.

54. The Easement also provides that Newport reserves the right to install, maintain, repair, and replace improvements on its property, subject to the limitation that it must not unduly interfere with PSE&G's ability to maintain and repair its cables:

> [Newport] reserve[s] the right to install, maintain, repair and replace any such improvements they may own within the Premises . . . *as will not unduly interfere with [PSE&G's] use of the Premises as set forth herein*. In the event of construction of substantial improvements within the Premises, [Newport] shall have the option of (a) notifying [PSE&G] of such improvements, at which time [PSE&G] shall move its cables at [Newport's] expense, or (b) [Newport] shall provide sufficient access for

> [PSE&G's] use of the Premises which shall not unduly interfere
> with [PSE&G's] ability to maintain and repair its cables. . . .

Ex. 1 ¶ 6 (emphasis added).

55.     The Easement includes an indemnification provision, which provides as

follows:

> [PSE&G] hereby agrees to indemnify and hold [Newport] harmless
> from and against any and all liabilities, losses, damages, claims,
> demands, actions, suits, judgments, charges, costs or expenses,
> including, without limitation, attorneys' fees and disbursements
> (including, without limitation, those incurred in enforcing this
> indemnity) arising from, out of or incident to the following
> regardless of fault, *unless arising from [Newport's] negligence*: (i)
> The grant of this easement and [PSE&G's] exercise or failure to
> exercise any rights granted herein; (ii) [PSE&G's] failure to fulfill
> any of its obligations under this Agreement; (iii) [PSE&G's] use or
> occupancy of the Premises whether pursuant to the terms hereof or
> otherwise; and (iv) All damage to property or injury and/or death
> to persons occurring on the Premises or by reason of, incident to or
> in connection with the easement herein granted.

Ex. 1 ¶ 13 (emphasis added).

56.     A controversy exists regarding PSE&G's and Newport's rights and

obligations under the Easement. In particular, PSE&G and Newport disagree regarding whether

the Easement imposes on Newport a general duty not to unduly interfere with PSE&G's use of

the Easement, including but not limited to PSE&G's ability to operate, repair, and inspect the

Cables within the Easement area. In addition, PSE&G and Newport disagree regarding whether

the easement (1) absolves Newport of all liability for acts of negligence and (2) includes an

agreement by PSE&G to indemnify Newport for acts of negligence.

57.     Pursuant to N.J.S.A. 2A:16-50-62, over which this Court has

supplemental jurisdiction under 28 U.S.C. § 1367, PSE&G is entitled to a declaration that the

Easement imposes on Newport a general duty not to unduly interfere with PSE&G's use of the

Easement, including but not limited to PSE&G's ability to operate, repair, and inspect the Cables within the Easement area.

58.     Pursuant to N.J.S.A. 2A:16-50-62, over which this Court has supplemental jurisdiction under 28 U.S.C. § 1367, PSE&G is entitled to a declaration that the easement (1) does not absolve Newport of all liability for acts of negligence and (2) does not include an agreement by PSE&G to indemnify Newport for acts of negligence.

## COUNT II
## Negligence Under Admiralty Law

59.     PSE&G repeats each of the foregoing allegations as though fully set forth.

60.     Newport owns the Sixth Street Pier, which is a pier that is along the navigable waters of the United States.

61.     Newport's negligence and other culpable conduct caused multiple multi-ton segments of concrete and other debris to fall onto the riverbed above the Cables. For example, Newport failed to maintain the Sixth Street Pier in such a manner that that would reasonably prevent multiple multi-ton segments of concrete and other debris from falling into the navigable waters and onto the riverbed on top of the Cables. Newport also intentionally pushed, dropped, or otherwise placed debris into navigable waters and onto the riverbed above the Cables.

62.     In addition, Newport initially blocked efforts to remove the concrete segments and other debris, exacerbating the damage resulting from the leak.

63.     Newport's negligent and intentional acts and omissions have caused, and continue to cause, injury to PSE&G, including by causing damage to one or more of the Cables,

causing one or more of the Cables to leak dielectric fluid, preventing the repair of the damaged

Cable(s), and causing PSE&G to suffer damages in an amount to be determined at trial.

## COUNT III
### Negligence Under New Jersey State Law

64.     PSE&G repeats each of the foregoing allegations as though fully set

forth.

65.     Newport's negligent and intentional acts and omissions have caused

multiple multi-ton segments of concrete and other debris to fall onto the riverbed on top of the

Cables, including from the Sixth Street Pier. In addition, Newport initially blocked efforts to

remove the concrete segments and other debris, exacerbating the damage resulting from the leak.

66.     Newport's negligent and intentional acts have caused, and continue to

cause, injury to PSE&G, including by causing damage to one or more of the Cables, causing one

or more of the Cables to discharge dielectric fluid, preventing the repair of the damaged

Cable(s), and causing PSE&G to suffer damages in an amount to be determined at trial.

## COUNT IV
### A Declaration of Liability Under the Oil Pollution Act of 1990

67.     PSE&G repeats each of the foregoing allegations as though fully set

forth.

68.     As detailed above, the United States Coast Guard has notified PSE&G

that PSE&G may be a "responsible party" under the OPA90 for the leak of dielectric fluid into

the Hudson River.

69.     PSE&G is facing imminent claims of liability. For example, pursuant to

OPA90, the Coast Guard has ordered PSE&G to undertake several enumerated actions to

remediate the leak by December 1, 2016, and non-compliance could result in fines or penalties.

Some boat owners also already have contacted PSE&G and demanded that PSE&G pay for the

removal of dielectric fluid from their vessels. Additionally, costs have been incurred, and will continue to be incurred until at least the fluid leak is stopped, in connection with cleaning up the fluid that has leaked into the Hudson River and repairing the leak.

70.    OPA90 provides that, if a responsible party "establishes that a discharge or threat of a discharge and the resulting removal costs and damages were caused solely by an act or omission of one or more third parties," then "the third party or parties shall be treated as the responsible party for purposes of determining liability under [OPA90]." 33 U.S.C. § 2702(d)(1)(A). Additionally, OPA90 provides that "[a] person may bring a civil action for contribution against any other person who is liable or potentially liable under [the OPA90] or another law." 33 U.S.C. § 2709.

71.    Newport's acts and omissions caused, in whole or in part, the leak of dielectric fluid into the Hudson River. Therefore, pursuant to 28 U.S.C. § 2201 and 33 U.S.C. § 2702(d)(1)(A), PSE&G is entitled to a declaration that Newport "shall be treated as the responsible party for purposes of determining liability under [OPA90]." Pursuant to 28 U.S.C. § 2201 and 33 U.S.C. § 2709, PSE&G also is entitled to a declaration that Newport is liable for contribution to PSE&G in connection with any and all liabilities, including damages, that have arisen or will arise in connection with the dielectric fluid leak.

**COUNT V [Reasserted]**
**Response Costs, Contribution, and a Declaratory Judgment Under CERCLA**

72.    PSE&G repeats each of the foregoing allegations as though fully set forth.

73.    Newport is the current owner of land in and around the Newport Marina in Jersey City, New Jersey, including the Sixth Street Pier and the underwater lands adjacent to the pier.  Under 42 U.S.C. § 9601(9), the underwater land in and around the Newport Marina is a

18

"facility," as defined by CERCLA, as it is an "area where a hazardous substance has been deposited . . . or otherwise come to be located."

74.     Newport was the owner of the facility at the time of the release of dielectric fluid. Therefore, Newport is a responsible party pursuant to 42 U.S.C. § 9607(a)(1).

75.     PSE&G has incurred necessary response costs consistent with the National Contingency Plan and damages as a result of the releases of dielectric fluid from the Cables.  PSE&G has also engaged in removal and response actions under orders issued by the U.S. Coast Guard and the NJDEP, and has incurred response costs due to these "civil actions."

76.     Accordingly, Newport is a responsible party under 42 U.S.C. § 9607(a)(1) and is jointly and severally liable for response costs that have been incurred and will be incurred by PSE&G under 42 U.S.C. § 9607(a)(4)(B).

77.     There is a present and actual controversy between the parties concerning their respective rights and obligations in connection with response costs concerning the leak of dielectric fluid.  PSE&G is therefore entitled to a declaration under CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), and 28 U.S.C. §§ 2201 and 2202 against Newport declaring that Newport shall be liable to PSE&G for any and all removal and response costs arising from the leak of dielectric fluid, in addition to all other damages and losses recoverable under CERCLA, which shall be binding in any subsequent action to recover further costs and/or contribution arising from the same alleged leak of dielectric fluid at issue in this action.

78.     PSE&G is entitled to judgment against Newport as follows: (a) a declaration from the Court that Newport shall be responsible for all current and future costs arising from the leak of dielectric fluid; (b) requiring Newport to reimburse PSE&G for all

reasonable costs and expenses, including attorneys' fees; and (c) awarding PSE&G such other and further relief as the Court deems just and proper.

79.     Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), provides in pertinent party that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 . . . or under section 9607(a). . . ."

80.     The Court's December 28, 2017 Opinion and Order on Newport's motion to dismiss [ECF No. 62 at 35] dismissed PSE&G's prior claim for CERCLA contribution solely because a claim for contribution had not yet been made against PSE&G.  Since the date of that Opinion and Order, Newport and Con Edison have each asserted claims for contribution under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) [ECF No. 98 at Count XIV; ECF No. 101 at Count X], and, as such, PSE&G's claim is now ripe to be reasserted.

81.     Accordingly, Newport is liable to PSE&G under Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), for an equitable share of the necessary costs of response incurred by PSE&G.

## COUNT VII
### New Jersey Spill Compensation and Control Act

82.     PSE&G repeats each of the foregoing allegations as though fully set forth.

83.     Pursuant to the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et. seq. (Spill Act), a person who "cleans up or removes a discharge of a hazardous substance" has a right of contribution for "clean up and removal costs" against "all other dischargers and persons in any way responsible for a discharged hazardous substance." N.J.S.A. 58:10-23.11f.

84.     Newport is the current owner of land in and around the Newport Marina in Jersey City, New Jersey, including the Sixth Street Pier and the underwater lands adjacent to the pier and Newport's act and omissions caused in whole or in part the leak of dielectric fluid into the Hudson River. Accordingly, Newport qualifies as a person in any way responsible for a discharged hazardous substance under the New Jersey Spill Compensation and Control Act.

85.     As a result of Newport's acts and omissions, PSE&G has incurred cleanup and removal costs, and will continue to incur cleanup and removal costs in the future. Therefore, pursuant to the New Jersey Spill Compensation and Control Act, PSE&G is entitled to contribution in the amount of cleanup and removal costs incurred to date. PSE&G is additionally entitled to a declaration that Newport is strictly liable to PSE&G for cleanup and removal costs that PSE&G will incur in the future.

## COUNT VIII
## Violation of Easement

86.     PSE&G repeats each of the foregoing allegations as though fully set forth.

87.     The Easement does "grant unto [PSE&G] . . . a permanent thirty (30) foot wide non-exclusive subsurface easement as a right-of-way" for the purpose of, among other things, "operating, inspecting, [and] repairing" the Cables. Ex. 1.

88.     Newport violated, and continues to violate, the Easement because the presence of the concrete segments and debris obstructs PSE&G's right-of-way with respect to the Cables, and denies PSE&G all access to the Cables within the Easement area. The concrete segments and other debris are in the Easement area without PSE&G's consent, and their presence unduly interferes with PSE&G's rights under the Easement.

89.     PSE&G has suffered, and will continue to suffer, irreparable harm as a result of Newport's violation of the Easement. PSE&G also has suffered, and will continue to suffer, damages in an amount to be determined at trial.

**COUNT IX**
**Trespass and Nuisance**

90.     PSE&G repeats each of the foregoing allegations as though fully set forth at length herein.

91.     PSE&G has a property interest in the Cables.

92.     Upon information and belief, Newport caused concrete segments and other debris to fall into the Easement area, and onto the riverbed above the Cables.

93.     Upon information and belief, one or more of the Cables were damaged due to physical contact resulting from the fallen concrete segments and other debris. PSE&G did not authorize such contact, and such contact constitutes a trespass onto PSE&G's property.

94.     The presence of the concrete and other debris in the Easement area continues to damage the Cables by causing unauthorized physical contact. Thus, Newport is continuing to trespass on PSE&G's property.

95.     Newport's continuous acts of trespass qualify as a nuisance.

96.     PSE&G has been harmed, and continues to be harmed, by Newport's trespass and nuisance. PSE&G also has suffered, and will continue to suffer, damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, PSE&G respectfully requests that the Court grant the following relief:

1.      Issue a declaratory judgment declaring that the Easement imposes on Newport a general duty not to unduly interfere with PSE&G's use of the Easement, including but not limited to PSE&G's ability to operate, repair, and inspect the Cables within the Easement area.

2.      Issue a declaratory judgment declaring that the Easement does not absolve Newport of liability for acts of negligence and does not include an agreement by PSE&G to indemnify Newport for acts of negligence.

3.      Issue a declaratory judgment declaring that Newport shall be treated as the "responsible party" for purposes of determining liability under the OPA90.

4.      Issue a declaratory judgment declaring that Newport is strictly liable under CERCLA for all removal and response costs incurred, and to be incurred, by PSE&G, in addition to all other damages and losses recoverable under CERCLA. In the alternative, issue a declaratory judgment declaring that Newport is strictly liable under CERCLA for contribution for response costs and damages incurred, and to be incurred, by PSE&G, in addition to all other damages and losses recoverable under CERCLA.

5.      Issue a declaratory judgment declaring that Newport is strictly liable for all cleanup and removal costs incurred, and to be incurred, by PSE&G under the New Jersey Spill Compensation and Control Act.

6.      Issue a declaratory judgment declaring that Newport is liable to PSE&G for contribution in connection with any and all liabilities, including damages, that have arisen or will arise in connection with the dielectric fluid leak.

7.     Enter judgment in favor of PSE&G and against Newport for damages in an amount to be determined at trial, plus interest, including damages sufficient to compensate for harm caused to PSE&G's property.

8.     Issue an injunction enjoining Newport from interfering with PSE&G's rights under the Easement and requiring Newport to continue to remove the concrete segments and other debris from the Easement area until PSE&G is able to exercise its full rights under the Easement.

9.     Award costs and fees in favor of PSE&G and against Newport.

10.    Award such other and further relief in favor of PSE&G as the Court deems just and proper.

**GIBBONS P.C.**

Dated: December 24, 2020

By: s/ Lawrence S. Lustberg
Lawrence A. Lustberg
Thomas R. Valen
Kate Janukowicz
Marquis Whitney
Mary Bessemer
One Gateway Center
Newark, New Jersey 07102
llustberg@gibbonslaw.com
tvalen@gibbonslaw.com
kjanukowicz@gibbonslaw.com
mwhitney@gibbonslaw.com
mbessemer@gibbonslaw.com

*Attorneys for Plaintiff/Counterclaim Defendant/Crossclaim Plaintiff, Public Service Electric and Gas Company*

## AMENDED CROSSCLAIMS AGAINST CON EDISON

While denying that it is liable to Newport or any other party, PSE&G, by and through its attorneys, Gibbons P.C., states that in the event that it is determined that one or both of the Utilities is liable to Newport in connection with the leak of dielectric fluid from the Utilities' underwater electric cables under any of the claims set forth in Newport's Amended Counterclaims and Third-Party Complaint filed in this matter [ECF No. 98], that liability could only be premised upon acts or omissions that are the responsibility of Con Edison, and PSE&G therefore asserts the following Crossclaims against Con Edison:

## COUNT I
## Breach of Contract – Failure to Proper Install, Maintain & Repair

1.      In accordance with the parties' Interconnection Agreement dated May 22, 1975 (the "Interconnection Agreement") [Ex. 14] and amended on May 8, 1978 [Ex. 15] and May 9, 1978 [Ex. 16], PSE&G and Con Edison jointly own and operate two high-voltage electric cables that were installed in Defendant Newport's underwater land north of the Sixth Street Pier, within an area covered by an Easement between Newport and PSE&G.

2.      In the event that one or both of the Utilities is held liable to Newport as a result of negligence in connection with the installation, maintenance and/or repair of the Cables, Con Edison breached, and continues to breach, the Interconnection Agreements by failing to properly install, maintain and repair the Cables.

3.      Pursuant to Section 2.3 of the Interconnection Agreement, Con Edison is contractually obligated to "maintain the entire river crossing section of the Hudson-Farragut line . . . extending from the New York side of the Hudson River to the first manhole of the New Jersey side of the Hudson River." *See* Ex. 14 at Section 2.3.

4.      Additionally, under Section 6.2(b) of the Interconnection Agreement, Con Edison is obligated to make necessary capital improvements in connection with the Cables as required by law or an administrative body:

> Capital improvements, betterments, replacements, reinforcements or additions to either interconnection which are required by any statute or ordinance; judicial decree or order, rule, regulation, or other lawful requirement of any administrative body, or which are necessary in order not to be in conflict therewith, shall be made forthwith, except that the making of any such capital improvements, betterments, replacements, reinforcements or additions to either interconnection may be postponed during the period in which either party, in good faith, is contesting any such statute, ordinance, decree, rule, regulation, requirement. . . .

*See id.* at Section 6.2.

5.      Con Edison is therefore liable for all damages and costs incurred by PSE&G as a result of Con Edison's breach of the Interconnection Agreement, including in the amount of any judgment that may be entered in favor of Newport against PSE&G and for PSE&G's attorneys' fees and costs incurred in connection with defending against Newport's Counterclaims.

## COUNT II
### Breach of Contract – Failure to Satisfy Financial Obligations Under Interconnection Agreements

6.      PSE&G repeats and realleges the forgoing allegations of its Crossclaims as if fully set forth herein.

7.      In accordance with the parties' Interconnection Agreement, and amendments thereto, Con Edison was obligated to pay PSE&G annual and monthly carrying costs and fees in connection with the Cables.

8.      More specifically, Con Edison agreed to pay "Annual Charges" of $500,000 due under a 1978 amendment to 1975 agreement "for each succeeding year to the end of term as defined [in IV-A of C line agreement]."  *See* Ex. 16 at ¶ 1.

9.      Con Edison also agreed to pay "monthly operation and maintenance expenses" for the C line as "adjusted annually during the period of the agreement . . . ." Ex. 15 at Section II-E.

10.     Finally, Con Edison agreed that "additional payments to PS[E&G] for the use of [certain existing facilities on the PSE&G system that] will continue beyond the 30-year period commencing with the commercial operation of Step I A.C. Plan facilities, until the termination date of the agreement as defined in Item IV-A below . . . ." _Id._ at Section III-I.

11.     While PSE&G and Con Edison have not agreed regarding when the Interconnection Agreements terminated or will terminate, Con Edison has taken the position that those agreements are still in effect as of this date.  *See* ECF 101 (Con Edison's Counterclaims against PSE&G) at ¶ 8 ("**At all times**, the B Line Agreement, as amended, and the C Line Agreement have governed the actions of Con Edison and PSE&G with regard to ownership and operation of the B and C Lines") (emphasis added); *see also* ECF 113 (Con Edison's Opposition to PSE&G's Motion to Dismiss) at p. 4 (contending that the Interconnection Agreements "terminate[ ] completely 'at the end of the year 2020.'"); ECF 118 (Letter from Con Edison to Judge McNulty) at pp. 1-2 (asking the Court to take judicial notice of FERC's determination that "the Interconnection Agreements are valid, enforceable contracts that govern the rights and obligations of Con Edison and PSE&G with respect to the B and C Lines.").

12.     Con Edison has not fulfilled these obligations and has failed to pay PSE&G since March 2012, resulting in an amount in arrears that is significant.

13.     Con Edison's failure to pay those fees constitutes a breach of the Interconnection Agreements.

14.     Con Edison is therefore liable for all damages and costs incurred by PSE&G as a result of Con Edison's breach of the Interconnection Agreement, including, but not limited to the carrying costs and fees required under the Interconnection Agreements.

## COUNT III
## Indemnification Under the Interconnection Agreements

17.     PSE&G repeats and realleges the foregoing allegations of its Crossclaims as if fully set forth herein.

18.     In the event that PSE&G is held liable to Newport for its Counterclaims, then Con Edison is contractually obligated to indemnify and hold harmless PSE&G from Newport's claims pursuant to Section 6.8 of the parties' Interconnection Agreement, which provides that Con Edison is, among other things, required to:

> indemnify and to save [PSE&G] harmless from any expense, claim, loss or damage of any kind whatsoever arising out of or in connection with functions performed by Con Edison hereunder, or arising out of the condition of the facilities . . .  Such indemnification shall apply irrespective of any negligence or alleged negligence on the part of the party being indemnified.

19.     The Interconnection Agreement Indemnity provision is valid and enforceable.

20.     In the event that Newport succeeds on its claims against PSE&G because those claims arise out of the alleged negligent acts, errors, or omissions of Con Edison in the performance of its obligations under the Interconnection Agreements, Con Edison is contractually obligated to indemnify and hold harmless PSE&G in the amount of any judgment that may be entered in favor of Newport against PSE&G and for PSE&G's attorneys' fees and costs incurred in connection with defending against Newport's Counterclaims.

## COUNT IV
### Negligence Under New Jersey State Law and Admiralty Law

21.     PSE&G repeats and realleges the foregoing allegations of its Crossclaims as if fully set forth herein.

22.     PSE&G has property rights in the portion of the riverbed of the Hudson River adjacent to the Cables by virtue of its Easement with Newport.  Specifically, the Easement grants PSE&G "a permanent thirty (30) foot wide non-exclusive subsurface easement as a right-of-way, with all the rights and privileges herein granted."  *See* [ECF No. 40-1] Ex. 1 to PSE&G's Amended Complaint.

23.     In the event that one or both of the Utilities is held liable to Newport as a result of the negligence of either in connection with the installation, maintenance and repair of the Cables, then Con Edison is responsible because it would have breached its duty owed to PSE&G to properly install, maintain, protect and repair the Cables, not to damage PSE&G's property rights to the Easement, and not to inflict economic harm on PSE&G.

24.     Con Edison is therefore liable for damages incurred by PSE&G as a result of Con Edison's negligence in at least the amount of any judgment that may be entered in favor of Newport against PSE&G and for PSE&G's attorneys' fees and costs incurred in connection with defending against Newport's Counterclaims.

## COUNT V
### Trespass and Nuisance

25.     PSE&G repeats and realleges the foregoing allegations of its Crossclaims as if fully set forth herein.

26.     PSE&G has property rights in the portion of the riverbed of the Hudson River adjacent to the Cables by virtue of its Easement with Newport.

27.     In the event that PSE&G is held liable to Newport on its Counterclaims, then Con Edison is responsible because, as a result of its failure to properly install, maintain, protect and repair the Cables, Con Edison intentionally, recklessly, or negligently caused dielectric fluid to be discharged from the Cables onto PSE&G's property and without PSE&G's consent.

28.     The discharge of dielectric fluid damaged PSE&G's property, interfered with PSE&G's use and enjoyment of its property, and caused other losses to PSE&G in at least the amount of any judgment that may be entered in favor of Newport against PSE&G and for PSE&G's attorneys' fees and costs incurred in connection with defending against Newport's Counterclaims.

## COUNT VI
### Response Costs, Declaratory Judgment and Contribution Pursuant to CERCLA

29.     PSE&G repeats and realleges the foregoing allegations of its Crossclaims as if fully set forth herein.

30.     Con Edison is an owner and operator of such facility or facilities under CERCLA. 42 U.S.C. § 9601(20).  Further, Con Edison and PSE&G are "persons" within the meaning of Section 101(21) and Sections 107(a) and 113(f)(1) of CERCLA.

31.     PSE&G has incurred necessary response costs consistent with the National Contingency Plan and damages as a result of the release of dielectric fluid from the Lines. PSE&G has also engaged in removal and response actions under orders issued by the U.S. Coast Guard, the New Jersey Department of Environmental Protection and the United States Army Corps of Engineers, and has incurred response costs due to these "civil actions."

32.     Accordingly, Con Edison is a responsible party and therefore jointly and severally liable to PSE&G under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for all necessary costs

of response consistent with the National Contingency Plan and damages as a result of the release of dielectric fluid from the Cables.

33.     There is a present and actual controversy between the parties concerning their respective rights and obligations in connection with response costs concerning the leak of dielectric fluid.  PSE&G is therefore entitled to a declaration under CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), and 28 U.S.C. §§ 2201 and 2202 against Con Edison declaring that Con Edison shall be liable to PSE&G for any and all removal and response costs arising from the leak of dielectric fluid incurred by PSE&G, in addition to all other damages and losses recoverable under CERCLA, which shall be binding in any subsequent action to recover further costs and/or contribution arising from the same alleged leak of dielectric fluid at issue in this action.

34.     PSE&G is entitled to judgment against Con Edison as follows: (a) a declaration from the Court that Con Edison shall be responsible for all current and future costs arising from the leak of dielectric fluid; (b) requiring Con Edison to reimburse PSE&G for all reasonable costs and expenses, including attorneys' fees; and (c) awarding PSE&G such other and further relief as the Court deems just and proper.

35.     Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), provides in pertinent part that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 . . . or under section 9607(a). . . ."

36.     The Court's December 28, 2017 Opinion and Order on Newport's motion to dismiss [ECF No. 62 at 35] dismissed PSE&G's prior claim for CERCLA contribution solely because a claim for contribution had not yet been made against PSE&G.  Since the date of that Opinion and Order, Newport and Con Edison have each asserted claims for contribution under

Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) [ECF No. 98 at Count XIV; ECF No. 101 at Count X], and, as such, PSE&G's claim is now ripe to be reasserted.

37.     Accordingly, Con Edison is liable to PSE&G under Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), for an equitable share of the necessary costs of response incurred by PSE&G consistent with the National Contingency Plan and response costs.

<div align="center">

**COUNT VII**
**Oil Pollution Act of 1990**

</div>

38.     PSE&G repeats and realleges the foregoing allegations of its Crossclaims as if fully set forth herein.

39.     The United States Coast Guard has notified PSE&G that PSE&G may be a "responsible party" under the Oil Pollution Act of 1990 ("OPA90") for the leak of dielectric fluid in to the Hudson River.

40.     OPA90 provides that, if a responsible party "establishes that a discharge or threat of a discharge and the resulting removal costs and damages were caused solely by an act or omission of one or more third parties," then "the third party or parties shall be treated as the responsible party for purposes of determining liability under [OPA90]."   33 U.S.C. § 2702(d)(1)(A).   Additionally, OPA90 provides that "[a] person may bring a civil action for contribution against any other person who is liable or potentially liable under [the OPA90] or another law." 33 U.S.C. § 2709.

41.     PSE&G has incurred and will continue to incur costs in connection with remediating the dielectric fluid.

42.     In the event that PSE&G is held liable to Newport for its OPA90 Counterclaims, then Con Edison's acts and omissions in failing to properly install, maintain, protect and repair the Cables caused, in whole or in part, the leak of dielectric fluid into the Hudson River.

43.     Therefore, pursuant to 28 U.S.C. § 2201 and 33 U.S.C. § 2702(d)(1)(A), PSE&G is entitled to a declaration that Con Edison "shall be treated as the responsible party for purposes of determining liability under [OPA90]." Pursuant to 28 U.S.C. § 2201 and 33 U.S.C. § 2709, PSE&G is also entitled to a declaration that Con Edison is liable for contribution to PSE&G in connection with any and all liabilities, including damages, that have arisen or will arise in connection with the dielectric fluid leak including, but not limited to, the amount of any judgment that may be entered in favor of Newport against PSE&G and for PSE&G's attorneys' fees and costs incurred in connection with defending against Newport's Counterclaims.

**COUNT VIII**
**Contribution and Declaratory Relief Under the**
**New Jersey Spill Compensation and Control Act**
**("NJ Spill Act")**

44.     PSE&G repeats and realleges the foregoing allegations of its Crossclaims as if fully set forth herein.

45.     Pursuant to the NJ Spill Act, N.J.S.A. § 58:10-23.11, *et seq.,* a person who "cleans up or removes a discharge of a hazardous substance" has a right of contribution for "clean up and removal costs" against "all other dischargers and persons in any way responsible for a discharged hazardous substance." N.J.S.A. § 58:10-23.11f.

46.     Con Edison qualifies as a person responsible for the discharged dielectric fluid under the NJ Spill Act because it has an ownership interest in and operational responsibility for the Cables and control of the dielectric fluid.

47.     PSE&G has incurred costs in connection with the cleanup and removal of that discharge.

48.     In the event that it is determined that PSE&G and/or Con Edison's acts and omissions caused the leak of dielectric fluid and allowed the leak to occur, PSE&G is entitled to

contribution from Con Edison under N.J.S.A. 58:10-23.11f(a)(2)(a) in the amount of the costs of the cleanup and removal of that discharge incurred by Newport and/or PSE&G.  PSE&G is additionally entitled to a declaration that Con Edison is liable to PSE&G for cleanup and removal costs that PSE&G will incur in the future.

### COUNT IX
### Contribution

49.     PSE&G repeats and realleges the foregoing allegations of its Crossclaims as if fully set forth herein.

50.     While denying that it is in any way liable to Newport or any other party, PSE&G asserts that if it is found liable to Newport, any damages sustained by Newport were caused by the conduct of Con Edison.  PSE&G demands contribution from Con Edison under the New Jersey Joint Tortfeasor Contribution Act (N.J.S.A. 2A:53A-1, *et seq.*) and/or the New Jersey Comparative Negligence Act (N.J.S.A.  2A:15-5, *et seq.*) for any pro rata share of any and all sums that may be adjudged against PSE&G.

### COUNT X
### Common Law Indemnification

51.     PSE&G repeats and realleges the foregoing allegations of its Crossclaims as if fully set forth herein.

52.     While denying that it is liable to Newport or any other party, PSE&G asserts that if it is found liable to Newport, any damages sustained by Newport were caused by the conduct of Con Edison.  PSE&G demands indemnification from Con Edison as any obligation imposed on PSE&G for the claims asserted by Newport or any other party would result solely from secondary, imputed, vicarious, or passive fault and could only be the result of negligence or other fault on the part of Con Edison.

34

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, PSE&G respectfully requests that the Court grant the following relief:

A.   Awarding PSE&G compensatory, statutory, and punitive damages against Con Edison in an amount to be determined at trial;

B.   Enter judgment against Con Edison pursuant to the Interconnection Agreement, requiring Con Edison to indemnify and hold harmless PSE&G from Newport's claims and awarding PSE&G all expenses, claims, losses and damages it incurs in connection with this action, and such other relief as the Court may deem just and proper;

C.   Declaring that Con Edison is a responsible party under the OPA and Con Edison is not entitled to any defense to liability to PSE&G under the OPA;

D.   Declaring that Con Edison is responsible for cleanup costs incurred by PSE&G under CERCLA and the N.J. Spill Act;

E.   Enter judgment in favor of PSE&G and against Con Edison for indemnification, together with all of the costs of suit and attorneys' fees it incurs in connection with this action, and such other relief as the Court may deem just and proper;

F.   Enter judgment in favor of PSE&G and against Con Edison for contribution, together with all of the costs of suit and attorney's fees it incurs in connection with this action, and such other relief as the Court may deem just and proper;

G.   Award costs and fees in favor of PSE&G and against Con Edison;

H.   Award such other and further relief in favor of PSE&G as the Court deems just and proper.

<div align="center">

**GIBBONS P.C.**

</div>

Dated: December 24, 2020                    By: <u>s/ Lawrence S. Lustberg          </u>

Lawrence S. Lustberg
Thomas R. Valen
Kate E. Janukowicz
Marquis A. Whitney
Mary K. Bessemer
One Gateway Center
Newark, New Jersey 07102
llustberg@gibbonslaw.com
tvalen@gibbonslaw.com
kjanukowicz@gibbonslaw.com
mwhitney@gibbonslaw.com
mbessemer@gibbonslaw.com

*Attorneys for Plaintiff/Counterclaim
Defendant/Crossclaim Plaintiff, Public
Service Electric and Gas Company*